# BOWEN, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* GILLIARD ET AL.

No. 86–509.   Argued April 22, 1987—Decided June 25, 1987*

---

*Together with No. 86–564, *Flaherty, Secretary, North Carolina Department of Human Resources, et al.* v. *Gilliard et al.*, also on appeal from the same court.

588

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, POWELL, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 609. BLACKMUN, J., filed a dissenting opinion, *post*, p. 634.

*Deputy Solicitor General Lauber* argued the cause for appellant in No. 86–509. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Willard, Jerrold J. Ganzfried,* and *William Kanter. Catherine C. McLamb,* Assistant Attorney General of North Carolina, argued the cause for appellants in No. 86–564. With her on the briefs were *Lacy H. Thornburg,* Attorney General, and *Lemuel W. Hinton,* Assistant Attorney General.

*Jane R. Wettach* argued the cause for appellees in both cases. With her on the brief were *Lucie E. White, Julius LeVonne Chambers, Eric Schnapper,* and *Jean M. Cary.*†

JUSTICE STEVENS delivered the opinion of the Court.

As part of its major effort to reduce the federal deficit through the Deficit Reduction Act of 1984, 98 Stat. 494, Congress amended the statute authorizing Federal Aid to Families with Dependent Children (AFDC)[1] to require that a family's eligibility for benefits must take into account, with certain specified exceptions, the income of all parents, brothers, and sisters living in the same home.[2] The principal

---

†Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Joan E. Bertin;* for Juvenile and Family Court Judges by *Thomas J. Madden;* and for the NOW Legal Defense and Education Fund et al. by *Sally F. Goldfarb, Sarah E. Burns,* and *Marsha Levick.*

[1] "'The AFDC program is based on a scheme of cooperative federalism.' *King* v. *Smith,* 392 U. S. 309, 316 (1968). Established by Title IV of the Social Security Act of 1935, 49 Stat. 627, 'to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them,' *Shea* v. *Vialpando,* 416 U. S. 251, 253 (1974), the federal program reimburses each State which chooses to participate with a percentage of the funds it expends. § 403, 42 U. S. C. § 603. In return, the State must administer its assistance program pursuant to a state plan that conforms to applicable federal statutes and regulations. § 402, 42 U. S. C. § 602." *Heckler* v. *Turner,* 470 U. S. 184, 189 (1985).

[2] The Deficit Reduction Act of 1984, 98 Stat. 494, which fills over 700 pages of the Statutes at Large, includes two major divisions, the Tax Reform Act of 1984 and the Spending Reduction Act of 1984. The amendment at issue in this case is found in the latter division, 98 Stat. 1145. As a result of that amendment, § 402(a)(38) of the Social Security Act, 42 U. S. C. § 602(a)(38) (1982 ed., Supp. III) now provides, in pertinent part:

"A State plan for aid and services to needy families with children must—

.          .          .          .          .

"(38) provide that in making the determination under paragraph (7) with respect to a dependent child and applying paragraph (8), the State agency shall (except as otherwise provided in this part) include—

"(A) any parent of such child, and

"(B) any brother or sister of such child, if such brother or sister meets the conditions described in clauses (1) and (2) of section 606(a) of this title,

question presented in this litigation is whether that require-
ment violates the Fifth Amendment to the United States
Constitution when it is applied to require a family wishing to
receive AFDC benefits to include within its unit a child for
whom child support payments are being made by a noncus-
todial parent.

I

This litigation began in 1970. At that time the federal
statute did not require that all parents and siblings be in-
cluded in an AFDC filing unit. Thus, for example, if a teen-
age child had significant income of her own, perhaps from
wages or perhaps in support payments from an absent par-
ent, the other members of her family could exclude her from
the filing unit in order to avoid disqualifying the entire family
from benefits or reducing its level of benefits.

Beaty Mae Gilliard, one of the named class members in the
1970 suit,[3] began receiving public assistance from North Car-

if such parent, brother, or sister is living in the same home as the de-
pendent child, and any income of or available for such parent, brother,
or sister shall be included in making such determination and applying
such paragraph with respect to the family (notwithstanding section 405(j)
of this title, in the case of benefits provided under subchapter II of this
chapter) . . . ."

Section 406(a), in turn, provides:

"The term 'dependent child' means a needy child (1) who has been de-
prived of parental support or care by reason of the death, continued ab-
sence from the home . . . or physical or mental incapacity of a parent, and
who is living with his father, mother, grandfather, grandmother, brother,
sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first
cousin, nephew, or niece, in a place of residence maintained by one or more
of such relatives as his or their own home, and (2) who is (A) under the age
of eighteen, or (B) at the option of the State, under the age of nineteen and
a full-time student in a secondary school (or in the equivalent level of voca-
tional or technical training), if before he attains age nineteen, he may rea-
sonably be expected to complete the program of such secondary school (or
such training)." 42 U. S. C. § 606(a).

[3] The class was comprised of "persons who have been or may be subject
to reduction of AFDC . . . benefits based upon unconstitutional or illegal
claim of credit by administering agencies for outside income and other re-

olina under AFDC in 1962. In February 1970, after her seventh child was born, the State automatically included him in the filing unit, thereby increasing the family's monthly allotment from $217 to $227 to reflect the difference between the benefit for a family of seven and the benefit for a family of eight. Gilliard was, however, also receiving $43.33 each month in child support from the baby's father. When a formal parental support order was entered in April 1970, the State credited the support payments against her account and reduced her monthly benefit to $184. Gilliard sued, contending that she had a statutory right to exclude her seventh child from the unit and thus to continue to receive the $217 benefit for a family of seven and also to retain the $43.33 paid by her youngest child's father. A three-judge District Court agreed with her reading of the statute and entered an order requiring the State to reinstate her benefits at the $217 level and to reimburse her for the improper credits of $43 per month. *Gilliard* v. *Craig*, 331 F. Supp. 587 (WDNC 1971). The District Court also granted classwide relief. We affirmed that judgment. 409 U. S. 807 (1972). No constitutional question was decided at that time.

Congress amended the AFDC program in 1975 to require, as a condition of eligibility, that applicants for assistance must assign to the State any right to receive child support payments for any member of the family included in the filing unit.[4] In response, North Carolina amended its laws to pro-

---

sources available to some but not all of a family group." *Gilliard* v. *Craig*, 331 F. Supp. 587, 588 (WDNC 1971).

[4] Section 402(a)(26)(A) provides:

"[A]s a condition of eligibility for aid, each applicant or recipient will be required—

"(A) to assign to the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid, and (ii) which have accrued at the time such assignment is executed . . . ." 42 U. S. C. § 602(a)(26)(A) (1982 ed., Supp. III).

The 1975 amendment also amended § 402 to require recipients to

"cooperate with the State (i) in establishing the paternity of a child born out of wedlock with respect to whom aid is claimed, and (ii) in obtaining

vide that the acceptance of public assistance on behalf of a dependent child would constitute an assignment of any right to support for that child. See N. C. Gen. Stat. § 110–137 (Supp. 1985). These amendments, however, did not harm recipients like Gilliard because they did not affect the right to define the family unit covered by an application and thereby to exclude children with independent income, such as a child for whom support payments were being made.

In 1983, the Secretary of Health and Human Services proposed certain amendments to the Social Security Act to "assure that limited Federal and State resources are spent as effectively as possible." Letter of 25 May 1983, to the Honorable George Bush, President of the Senate, App. 168–169 (hereinafter Heckler Letter). One of the Secretary's proposals was "to establish uniform rules on the family members who must file together for AFDC, and the situations in which income must be counted. In general, the parents, sisters, and brothers living together with a dependent child must all be included; the option of excluding a sibling with income, for example, would no longer be available." *Ibid.* The Secretary stressed that the improvements would result in an AFDC allocation program that "much more realistically reflects the actual home situation." *Id.*, at 169.

The Secretary's proposal was not enacted in 1983, but one of the provisions in the Deficit Reduction Act of 1984 (DEFRA) established a standard filing unit for the AFDC program. The Senate Finance Committee estimated that the change would save $455 million during the next three fiscal years. S. Print No. 98–169, p. 980 (1984) (hereinafter Senate Print). It explained the purpose of the amendment

---

support payments for such applicant and for a child with respect to whom such aid is claimed, or in obtaining any other other payments or property due such applicant or such child . . . ." 42 U. S. C. § 602(a)(26)(B) (1982 ed., Supp. III).

in language that removes any possible ambiguity in the relevant text of the statute:[5]

"Present Law

"There is no requirement in present law that parents and all siblings be included in the AFDC filing unit. Families applying for assistance may exclude from the filing unit certain family members who have income which might reduce the family benefit. For example, a family might choose to exclude a child who is receiving social security or child support payments, if the payments would reduce the family's benefits by an amount greater than the amount payable on behalf of the child. . . .

"Explanation of Provision

"The provision approved by the Committee would require States to include in the filing unit the parents and all dependent minor siblings (except SSI recipients and any stepbrothers and stepsisters) living with a child who applies for or receives AFDC. . . .

"This change will end the present practice whereby families exclude members with income in order to maximize family benefits, and will ensure that the income of family members who live together and share expenses is

---

[5] In support of the District Court's judgment, appellees have asked us to adopt a construction of the statute that is completely inconsistent with the intent of Congress as explained in the Secretary's request for the legislation, in the Senate Print, and in the Conference Report as well. Moreover, the arguments are inconsistent with the unambiguous regulations the Secretary has adopted to implement the statute. See 45 CFR § 206.10(a)(1)(vii) (1986). The District Court carefully considered these statutory arguments and rejected them. *Gilliard* v. *Kirk,* 633 F. Supp. 1529, 1548 (WDNC 1986). We agree with that court's analysis of the meaning of the statute and find no merit in appellees' statutory arguments advanced in this Court. See also *Gorrie* v. *Bowen,* 809 F. 2d 508, 513–516 (CA8 1987).

recognized and counted as available to the family as a whole." *Ibid.*

See also H. R. Conf. Rep. No. 98–861, p. 1407 (1984).

Because the 1984 amendment forced families to include in the filing unit children for whom support payments were being received, the practical effect was that many families' total income was reduced.[6] The burden of the change was mitigated somewhat by a separate amendment providing that the first $50 of child support collected by the State must be remitted to the family and not counted as income for the purpose of determining its benefit level.[7] See 42 U. S. C. §§ 602(a)(8)(A)(vi), 657(b)(1) (1982 ed., Supp. III). Thus, the net effect of the 1984 amendments for a family comparable to Gilliard's would include three changes: (1) the addition of the child receiving support would enlarge the filing unit and entitle the family to a somewhat larger benefit; (2) child support would be treated as family income and would be assigned to the State, thereby reducing the AFDC benefits by that amount; and (3) the reduction would be offset by $50 if that amount was collected from an absent parent. In sum, if the assigned support exceeded $50 plus the difference in the benefit level caused by adding the child or children receiving support, the family would suffer; if less than $50 and the difference in the benefit level was collected as support, it would not.

---

[6] For example, under the July 1985 levels of payment in North Carolina, a family of four with no other income would have received $269. A child's support income of $100 would therefore reduce the family's AFDC payment to $169 if that child was included in the filing unit. The family would have a net income of $269. But if the family were permitted to exclude the child from the unit and only claim the somewhat smaller benefit of $246 for a family of three, it could have collected that amount plus the excepted child's $100 and have a net income of $346. See App. 85.

[7] Therefore, under our example, n. 6, *supra*, the net income with the child included in the unit would have been $319.

## II

After North Carolina adopted regulations to comply with the 1984 amendments, some members of the class that had earlier obtained relief filed a motion to reopen the 1971 decree and obtain further relief on behalf of the class. The State impleaded the Secretary of Health and Human Services, contending that if the State's compliance with the federal statute resulted in any liability to appellees, the Federal Government should share in any payment of additional AFDC benefits. The District Court found that North Carolina's and the Department of Health and Human Services' regulations were in conformance with the statute,[8] but concluded that the statutory scheme violated both the Due Process Clause and the Takings Clause of the Fifth Amendment.[9]

The court interpreted North Carolina law as imposing a duty on the custodial parent to use child support money exclusively for the benefit of the child for whom it had been obtained,[10] and reasoned that a forced assignment of the support

---

[8] The Secretary of Health and Human Services promulgated the following regulation to implement the DEFRA amendments:

"For AFDC purposes only, in order for the family to be eligible, an application with respect to a dependent child must also include, if living in the same household and otherwise eligible for assistance:

"(A) Any natural or adoptive parent, or stepparent (in the case of States with laws of general applicability); and

"(B) Any blood-related or adoptive brother or sister." 45 CFR § 206.10 (a)(1)(vii) (1986).

North Carolina's implementing regulations are set forth in the District Court's opinion. 633 F. Supp., at 1533–1534.

[9] "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U. S. Const., Amdt. 5.

[10] The District Court relied on the following paragraph of the opinion of the North Carolina Supreme Court in *Goodyear* v. *Goodyear*, 257 N. C. 374, 379, 126 S. E. 2d 113, 117 (1962):

"While defendant [father] was and is obligated to make the monthly payments called for in his contract for the support of his children, plaintiff [mother] is not the beneficiary of the moneys which defendant must

money to the State in exchange for AFDC benefits for the entire family was a taking of the child's private property. *Gilliard* v. *Kirk*, 633 F. Supp. 1529, 1551–1555 (WDNC 1986). Additionally, the court reasoned that the use of the child's support money to reduce the Government's AFDC expenditures was tantamount to punishing the child for exercising the fundamental right to live with his or her family. *Id.*, at 1557. Because of the serious impact on the autonomy of the family—including the child's potential relationship with his or her noncustodial parent—"special judicial scrutiny" was considered appropriate, *id.*, at 1555–1557, and the deprivation of property and liberty effected by the statutory scheme could not, in the court's view, survive such scrutiny. We noted probable jurisdiction, 479 U. S. 1004 (1986).

The District Court was undoubtedly correct in its perception that a number of needy families have suffered, and will suffer, as a result of the implementation of the DEFRA amendments to the AFDC program. Such suffering is frequently the tragic byproduct of a decision to reduce or to modify benefits to a class of needy recipients. Under our structure of government, however, it is the function of Congress—not the courts—to determine whether the savings realized, and presumably used for other critical governmental functions, are significant enough to justify the costs to the individuals affected by such reductions. The Fifth Amendment "gives the federal courts no power to impose upon [Congress] their views of what constitutes wise economic or social policy," by telling it how "to reconcile the demands of . . .

---

pay. These moneys belong to the children. Plaintiff is a mere trustee for them. That part of the payments not reasonably necessary for support and maintenance, she must hold for the benefit of the children and account to them when they call upon her. She cannot, by contract with another person, profit at the expense of the children."

The *Goodyear* opinion did not purport to announce any rule of law unique to North Carolina; it quoted from Indiana and Iowa opinions and cited authorities from other jurisdictions.

needy citizens with the finite resources available to meet those demands." *Dandridge* v. *Williams*, 397 U. S. 471, 486, 472 (1970). Unless the Legislative Branch's decisions run afoul of some constitutional edict, any inequities created by such decisions must be remedied by the democratic processes. The District Court believed that the amendment at issue did conflict with both the Due Process Clause and the Takings Clause of the Fifth Amendment.[11] We consider these arguments in turn, and reject them.[12]

---

[11] The only Court of Appeals, see *Gorrie* v. *Bowen*, 809 F. 2d 508 (CA8 1987), and virtually all of the District Courts, that have addressed challenges to the inclusion of child support or other "exclusive use" funds have upheld the validity of these amendments, see, *e. g., Showers* v. *Cohen*, 645 F. Supp. 217 (MD Pa. 1986); *Sherrod* v. *Hegstrom*, 629 F. Supp. 150 (Ore. 1985); *Huber* v. *Blinzinger*, 626 F. Supp. 30 (ND Ind. 1985); *Oliver* v. *Ledbetter*, 624 F. Supp. 325 (ND Ga. 1985); *Ardister* v. *Mansour*, 627 F. Supp. 641 (WD Mich. 1986) (denying preliminary injunction); *Shonkwiler* v. *Heckler*, 628 F. Supp. 1013 (SD Ind. 1985) (denying preliminary injunction); cf. *Park* v. *Coler*, 143 Ill. App. 3d 727, 493 N. E. 2d 130 (1986); but see *Lesko* v. *Bowen*, 639 F. Supp. 1152 (ED Wis. 1986), appeal docketed, No. 86–744; *Baldwin* v. *Ledbetter*, 647 F. Supp. 623 (ND Ga. 1986), appeal docketed, No. 86–1140, stay pending appeal granted, 479 U. S. 1309 (1986) (POWELL, J., in chambers).

[12] After ruling that the DEFRA amendment of AFDC was unconstitutional, the District Court considered the form of relief appellees were entitled to. In addition to granting prospective relief, the court ordered the state defendants to "pay retroactive AFDC benefits to all families in North Carolina whose benefits were denied, reduced or terminated as a result of the enforcement" of the state regulations. 633 F. Supp., at 1563. In response to the State's argument that the Eleventh Amendment barred such a retroactive award, the District Court explained that the State had continuously been bound by the court's 1971 injunction, and that if the State believed DEFRA had changed the applicable law, it should have sought modification of the injunction. *Id.*, at 1563–1564. Because we interpret the District Court's award of both prospective and retroactive relief to rest on its holding that the DEFRA amendment was unconstitutional, and read its discussion of the 1971 injunction as responding to the State's claim that an award of retroactive benefits was barred by the Eleventh Amendment, see *Edelman* v. *Jordan*, 415 U. S. 651, 667–668 (1974), our ruling that the DEFRA amendment is constitutionally valid requires reversal of both the

## III

The precepts that govern our review of appellees' due process and equal protection challenges to this program are similar to those we have applied in reviewing challenges to other parts of the Social Security Act:

> "[O]ur review is deferential. 'Governmental decisions to spend money to improve the general public welfare in one way and not another are "not confided to the courts. The discretion belongs to Congress unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment."' *Mathews* v. *De Castro*, 429 U. S. 181, 185 (1976), quoting *Helvering* v. *Davis*, 301 U. S. 619, 640 (1937)." *Bowen* v. *Owens*, 476 U. S. 340, 345 (1986).

This standard of review is premised on Congress' "plenary power to define the scope and the duration of the entitlement to . . . benefits, and to increase, to decrease, or to terminate those benefits based on its appraisal of the relative importance of the recipients' needs and the resources available to fund the program." *Atkins* v. *Parker*, 472 U. S. 115, 129 (1985); see also *Schweiker* v. *Hogan*, 457 U. S. 569 (1982); *Califano* v. *Boles*, 443 U. S. 282, 296 (1979); *California* v. *Aznavorian*, 439 U. S. 170 (1978); *Weinberger* v. *Salfi*, 422 U. S. 749 (1975).

The District Court had before it evidence that the DEFRA amendment was severely impacting some families. For example, some noncustodial parents stopped making their support payments because they believed that their payments were helping only the State, and not their children. 633 F. Supp., at 1542–1543. It is clear, however, that in the administration of a fund that is large enough to have a significant

---

District Court's award of prospective relief and its award of retroactive relief.

impact on the Nation's deficit, general rules must be examined in light of the broad purposes they are intended to serve.[13] The challenged amendment unquestionably serves Congress' goal of decreasing federal expenditures. See Senate Print, at 981 (estimating that amendment in AFDC program will save $455 million during fiscal years 1984 through 1987); 130 Cong. Rec. 8368 (1984) (remarks of Sen. Dole). The evidence that a few noncustodial parents were willing to violate the law by not making court-ordered support payments does not alter the fact that the entire program has resulted in saving huge sums of money.

The rationality of the amendment denying a family the right to exclude a supported child from the filing unit is also supported by the Government's separate interest in distributing benefits among competing needy families in a fair way. Given its perceived need to make cuts in the AFDC budget, Congress obviously sought to identify a group that would suffer less than others as a result of a reduction in benefits. When considering the plight of two five-person families, one of which receives no income at all while the other receives regular support payments for some of the minor children, it is surely reasonable for Congress to conclude that the former is in greater need than the latter. This conclusion is amply supported by Congress' assumption that child support payments received are generally beneficial to the entire family unit, see Senate Print, at 980, and by "the common sense proposition that individuals living with others usually have reduced per capita costs because many of their expenses are shared." *Termini* v. *Califano*, 611 F. 2d 367, 370 (CA2

---

[13] "General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases. *Weinberger* v. *Salfi*, 422 U. S. 749, 776." *Califano* v. *Jobst*, 434 U. S. 47, 53 (1977).

1979); see also *Lyng* v. *Castillo,* 477 U. S. 635, 638–643 (1986).[14]

It was therefore rational for Congress to adjust the AFDC program to reflect the fact that support money generally provides significant benefits for entire family units. This conclusion is not undermined by the fact that there are no doubt many families in which some—or perhaps all—of the support money is spent in a way that does not benefit the rest of the family. In determining how best to allocate limited funds among the extremely large class of needy families eligible for AFDC benefits, Congress is entitled to rely on a classwide presumption that custodial parents have used, and may legitimately use, support funds in a way that is beneficial to entire family units. As we have repeatedly explained:

"If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in

---

[14] An assumption that child support payments to families receiving AFDC benefits are typically used for the entire family's needs is entirely reasonable. See Senate Print, at 980 (amendment will "ensure that the income of family members who live together and share expenses is recognized"). This conclusion does not rest on an assumption that custodial parents routinely violate state-law restrictions on the use of support money. For the requirement that the support income be used for the "benefit" of the child does not preclude its use for common expenses. Moreover, the custodial parent's duty to benefit the supported child is not necessarily served simply by spending more money on him or her than on other children living in the same home. As the District Court recognized, nothing in North Carolina law requires a custodial parent to focus only on the economic interest of the child receiving support without taking into account the emotional and psychological welfare of the child. Congress' finding that custodial parents were routinely using the support funds for the entire family thus reflects the reality that such use is typically proper since expenditures for an entire family unit typically benefit each member of the household. We do not question Congress' reliance on the Secretary of Health and Human Services' assurance that counting child support income as part of the family income "much more realistically reflects the actual home situation." Heckler Letter, App. 168–169.

practice it results in some inequality.' *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co.* v. *City of Chicago*, 228 U. S. 61, 69–70. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan* v. *Maryland*, 366 U. S. 420, 426." *Dandridge* v. *Williams*, 397 U. S., at 485.

See also *Weinberger* v. *Salfi*, 422 U. S., at 785. We have no doubt that the DEFRA amendment satisfies this test.[15]

Appellees argue (and the District Court ruled), however, that finding that Congress acted rationally is not enough to sustain this legislation. Rather, they claim that some form of "heightened scrutiny" is appropriate because the amendment interferes with a family's fundamental right to live in the type of family unit it chooses.[16] We conclude that the District Court erred in subjecting the DEFRA amendment to any form of heightened scrutiny. That some families may decide to modify their living arrangements in order to avoid the effect of the amendment, does not transform the amend-

---

[15] Congress' presumption is similar to the one made in § 402(a)(31), 42 U. S. C. § 602(a)(31), which provides that portions of a stepparent's income are to be considered as part of the family income for AFDC purposes. In *Brown* v. *Heckler*, 589 F. Supp. 985 (ED Pa. 1984), aff'd, 760 F. 2d 255 (CA3 1985), the court explained that the presumption that a stepparent will assist in supporting his or her spouse's children is rational, even though stepparents are under no legal duty to assist the children, and not every stepparent does. See also *Kollett* v. *Harris*, 619 F. 2d 134 (CA1 1980) (holding that inclusion of stepparent's income as available to child in the Supplemental Security Income program was not unconstitutionally irrational).

[16] For example, the District Court had before it an affidavit from one mother who stated that she had sent a child to live with the child's father in order to avoid the requirement of including that child, and the support received from the child's father, in the AFDC unit. 633 F. Supp., at 1537–1538.

ment into an act whose design and direct effect are to "intrud[e] on choices concerning family living arrangements." *Moore* v. *East Cleveland*, 431 U. S. 494, 499 (1977).[17]  As was the case with the marriage-related provision upheld in *Califano* v. *Jobst*, 434 U. S. 47 (1977), "Congress adopted this rule in the course of constructing a complex social welfare system that necessarily deals with the intimacies of family life.  This is not a case in which government seeks to foist orthodoxy on the unwilling." *Id.*, at 54, n. 11.

Last Term we rejected a constitutional challenge to a provision in the Federal Food Stamp Program, which determines eligibility and benefit levels on a "household" rather than an individual basis.  *Lyng* v. *Castillo*, 477 U. S. 635 (1986).[18]  We held that the guarantee of equal treatment in the Due Process Clause of the Fifth Amendment was not violated by the statutory requirement that generally treated parents, children, and siblings who lived together as a single household, and explained:

> "The disadvantaged class is that comprised by parents, children, and siblings.  Close relatives are not a 'suspect' or 'quasi-suspect' class.  As a historical matter, they have not been subjected to discrimination; they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and they are not a minority or politically powerless.  See, *e. g.*, *Massachusetts Board of Retirement* v. *Murgia*, 427

---

[17] If the DEFRA amendment's indirect effects on family living arrangements were enough to subject the statute to heightened scrutiny, then the entire AFDC program might also be suspect since it generally provides benefits only to needy families without two resident parents.  Surely this creates incentive for some needy parents to live separately.  The answer, of course, is that these types of incentives are the unintended consequences of many social welfare programs, and do not call the legitimacy of the programs into question.

[18] The District Court denied appellants' motion for reconsideration in light of our decision in *Lyng*.  App. to Juris. Statement in No. 86–509, p. 107a.

U. S. 307, 313–314 (1976) *(per curiam)*. In fact, quite the contrary is true.

"Nor does the statutory classification 'directly and substantially' interfere with family living arrangements and thereby burden a fundamental right. *Zablocki* v. *Redhail,* 434 U. S. 374, 386–387, and n. 12 (1978). See *id.,* at 403–404 (STEVENS, J., concurring); *Califano* v. *Jobst,* 434 U. S. 47, 58 (1977)." *Id.,* at 638.

In light of this, we concluded in *Lyng* that the "District Court erred in judging the constitutionality of the statutory distinction under 'heightened scrutiny.'" *Ibid.* In this case the District Court committed the same error. As in *Lyng,* the standard of review here is whether "Congress had a rational basis" for its decision. *Id.,* at 639. And as in *Lyng,* "the justification for the statutory classification is obvious." *Id.,* at 642. The provisions at issue do not violate the Due Process Clause.[19]

## IV

Aside from holding that the amendment violated the Due Process Clause of the Fifth Amendment and its equal protection component, the District Court invalidated the DEFRA

---

[19] Nor is there any merit in the contention that the assignment provision, see *supra,* at 591, and n. 4, violates the Due Process Clause. Once it is determined that it is permissible to include all members of the family in the unit, the assignment of the benefits typically has no adverse effect on the child receiving support. To the contrary, through the assignment provision the Government takes over the responsibility of making sure that noncustodial parents actually perform their child support obligations. The State also bears the risk of nonpayment of support, since the family receives the identical amount of AFDC (although not the $50 supplement) whether or not the absent parent makes payments. In the first 10 years following the adoption of the assignment requirement in 1975, legal paternity was established for more than 1.5 million children, more than 3.5 million support orders were established, and $6.8 billion in support obligations was collected on behalf of children in AFDC families. 1 Office of Child Support Enforcement, U. S. Dept. of Health & Human Services, A Decade of Child Support Enforcement 1975–1985: Tenth Annual Report to Congress for the Period Ending September 30, 1985, pp. iii, 6, 9–10 (1985).

amendments as a taking of private property without just compensation. The court based this holding on the premise that a child for whom support payments are made has a right to have the support money used exclusively in his or her "best interest." Yet, the court reasoned, the requirements (1) that a custodial parent who applies for AFDC must include a child's support money in computing family income, and (2) that the support must be assigned to the State, effectively converts the support funds that were once to be used exclusively for the child's best interests into an AFDC check which, under federal law, must be used for the benefit of all the children. § 405, 42 U. S. C. § 605. Therefore, the District Court held that the State was "taking" that child's right to exclusive use of the support money. In addressing this issue, it is helpful to look first at whether the State "takes" the child's property when it considers the support payments as part of the family's income in computing AFDC eligibility. We will then consider whether the requirement that support payments be assigned to the State requires a finding that the amendments violate the taking prohibition.

Some perspective on the issue is helpful here. Had no AFDC program ever existed until 1984, and had Congress then instituted a program that took into account support payments that a family receives, it is hard to believe that we would seriously entertain an argument that the new benefit program constituted a taking. Yet, somehow, once benefits are in place and Congress sees a need to reduce them in order to save money and to distribute limited resources more fairly, the "takings" label seems to have a bit more plausibility. For legal purposes though, the two situations are identical. See Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U. S. 41 (1986). Congress is not, by virtue of having instituted a social welfare program, bound to continue it at all, much less at the same benefit level. Thus, notwithstanding the technical legal arguments that have been advanced, it is imperative to recognize that

the amendments at issue merely incorporate a definitional element into an entitlement program. It would be quite strange indeed if, by virtue of an offer to *provide* benefits to needy families through the entirely voluntary AFDC program, Congress or the States were deemed to have *taken* some of those very family members' property.

The basic requirement that the AFDC filing unit must include all family members living in the home, and therefore that support payments made on behalf of a member of the family must be considered in determining that family's level of benefits, does not even arguably take anyone's property. The family members other than the child for whom the support is being paid certainly have no takings claim, since it is clear that they have no protected property rights to continued benefits at the same level. See *Public Agencies Opposed to Social Security Entrapment, supra.* Nor does the simple inclusion of the support income in the benefit calculation have any legal effect on the child's right to have it used for his or her benefit. To the extent that a child has the right to have the support payments used in his or her "best interest," he or she fully retains that right. Of course, the effect of counting the support payments as part of the filing unit's income often reduces the family's resources, and hence increases the chances that sharing of the support money will be appropriate. See n. 13, *supra.* But given the unquestioned premise that the Government has a right to reduce AFDC benefits generally, that result does not constitute a taking of private property without just compensation.

The only possible legal basis for appellees' takings claim, therefore, is the requirement that an applicant for AFDC benefits must assign the support payments to the State, which then will remit the amount collected to the custodial parent to be used for the benefit of the entire family. This legal transformation in the status of the funds, the argument goes, modifies the child's interest in the use of the money so dramatically that it constitutes a taking of the child's

property. As a practical matter, this argument places form over substance, and labels over reality. Although it is true that money which was earmarked for a specific child's or children's "best interest" becomes a part of a larger fund available for all of the children, the difference between these concepts is, as we have discussed, more theoretical than practical.[20]

In evaluating whether governmental regulation of property constitutes a "taking" we have "eschewed the development of any set formula . . . and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case." *Connolly* v. *Pension Benefit Guaranty Corporation,* 475 U. S. 211, 224 (1986).

> "To aid in this determination, however, we have identified three factors which have 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' *Penn Central Transportation Co.,* [438 U. S. 104,] 124." *Id.,* at 224–225.

Here, each of these three factors refutes the conclusion that there has been a taking.

First, in evaluating the economic impact of the assignment, it is important to remember that it is the impact on the child, not on the entire family unit, that is relevant. Thus, the fact

---

[20] In analyzing the effect of the assignment it is again instructive to ask what would happen to the support payments if there were no AFDC program at all. In that case, it would appear that custodial parents would have to use a much greater portion of the support payments to sustain the family unit, since it could hardly be deemed in the child's best interest for his custodial parent and siblings to have no funds whatsoever. The overall practical effect of the AFDC program (even after the 1984 amendment), therefore, is to enhance the probability that a child whose custodial parent is receiving support payments in the child's behalf will obtain direct economic benefit from those funds, in addition to the benefits that result from preserving the family unit. A reduction in that enhancement is no more a taking than any other reduction in a Social Security program.

that the entire family's net income may be reduced does not necessarily mean that the amount of money spent for the benefit of a supported child will be any less than the amount of the noncustodial parent's support payments. The reality is that the money will usually continue to be used in the same manner that it was previously since the typical AFDC parent will have used the support money as part of the general family fund even without its being transferred through AFDC. See n. 13, *supra*. Moreover, any diminution in the value of the support payments for the child is mitigated by the extra $50 that the family receives as a result of the assignment, by the extra AFDC benefits that are received by the inclusion of an additional family member in the unit, and by the fact that the State is using its own enforcement power to collect the support payments, and is bearing the risk of nonpayment in any given month. Whatever the diminution in value of the child's right to have support funds used for his or her "exclusive" benefit may be, it is not so substantial as to constitute a taking under our precedents. See *Keystone Bituminous Coal Assn.* v. *DeBenedictis*, 480 U. S. 470, 493–497 (1987); *Agins* v. *Tiburon*, 447 U. S. 255, 260 (1980); *Penn Central Transportation Co.* v. *New York City*, 438 U. S. 104, 131 (1978).

Second, the child receiving support payments holds no vested protectable expectation that his or her parent will continue to receive identical support payments on the child's behalf, and that the child will enjoy the same rights with respect to them. See *Layton* v. *Layton*, 263 N. C. 453, 456, 139 S. E. 2d 732, 734 (1965) (support is "not a property right of the child"). The prospective right to support payments, and the child's expectations with respect to the use of such funds, are clearly subject to modification by law, be it through judicial decree, state legislation, or congressional enactment. See N. C. Gen. Stat. § 50–13.7 (1984) (modification of order for child support). For example, one of the chief criteria in assessing a child support obligation is the noncustodial parent's ability to make payments, see *Coggins*

v. *Coggins*, 260 N. C. 765, 133 S. E. 2d 700 (1963); Douglas, Factors in Determining Child Support, 36 Juvenile & Fam. Court J., No. 3, p. 27 (1985), and an adverse change in that parent's ability may, of course, require a modification of the decree. 2 J. Atkinson, Modern Child Custody Practice § 10.25, pp. 527–528 (1986) (discussing reductions in support). Any right to have the State force a noncustodial parent to make payments is, like so many other legal rights (including AFDC payments themselves), subject to modification by "the public acts of government." *Reichelderfer* v. *Quinn*, 287 U. S. 315, 319 (1932); see generally *Public Agencies Opposed to Social Security Entrapment*, 477 U. S., at 51–56. As the District Court explained, Congress, and the States, through their implementing statutes and regulations, have modified those rights through passage of (and the States' compliance with) the DEFRA amendments. See 633 F. Supp., at 1548–1551; *Gorrie* v. *Bowen*, 809 F. 2d 508, 521 (CA8 1987). This prospective change in the child's expectations concerning future use of support payments is far from anything we have ever deemed a taking.

Finally, the character of the governmental action here militates against a finding that the States or Federal Government unconstitutionally take property through the AFDC program. It is obviously necessary for the Government to make hard choices and to balance various incentives in deciding how to allocate benefits in this type of program. But a decision to include child support as part of the family income certainly does not implicate the type of concerns that the Takings Clause protects. This is by no means an enactment that forces "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960).

The law does not require any custodial parent to apply for AFDC benefits. Surely it is reasonable to presume that a

parent who does make such an application does so because she or he is convinced that the family as a whole—as well as *each* child committed to her or his custody—will be better off with the benefits than without. In making such a decision, the parent is not taking a child's property without just compensation; nor is the State doing so when it responds to that decision by supplementing the collections of support money with additional AFDC benefits.

## V

Writing for a unanimous Court, Justice Stewart described the courts' role in cases such as this:

> "We do not decide today that the . . . regulation is wise, that it best fulfills the relevant social and economic objectives that [Congress] might ideally espouse, or that a more just and humane system could not be devised. Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. The Constitution may impose certain procedural safeguards upon systems of welfare administration, *Goldberg* v. *Kelly*, [397 U. S. 254 (1970)]. But the Constitution does not empower this Court to second-guess . . . officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Dandridge* v. *Williams*, 397 U. S., at 487.

The judgment of the District Court is

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Government in the modern age has assumed increasing responsibility for the welfare of its citizens. This expansion of

responsibility has been accompanied by an increase in the scale and complexity of the activities that government conducts. Respect for the enormity of the administrative task that confronts the modern welfare state, as well as for the scarcity of government resources, counsels that public officials enjoy discretion in determining the most effective means of fulfilling their responsibilities.[1]

The very pervasiveness of modern government, however, creates an unparalleled opportunity for intrusion on personal life. In a society in which most persons receive some form of government benefit, government has considerable leverage in shaping individual behavior. In most cases, we acknowledge that government may wield its power even when its actions likely influence choices involving personal behavior. On certain occasions, however, government intrusion into private life is so direct and substantial that we must deem it intolerable if we are to be true to our belief that there is a boundary between the public citizen and the private person.

This is such a case. The Government has told a child who lives with a mother receiving public assistance that it cannot both live with its mother and be supported by its father. The child must either leave the care and custody of the mother, or forgo the support of the father and become a Government client. The child is put to this choice not because it seeks Government benefits for itself, but because of a fact over which it has no control: the need of *other* household members for public assistance. A child who lives with one parent has, under the best of circumstances, a difficult time sustaining a relationship with both its parents. A crucial bond between a child and its parent outside the home, usually the father, is the father's commitment to care for the material

---

[1] As we have said with respect to the Social Security program, for instance, "[g]eneral rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." *Califano* v. *Jobst,* 434 U. S. 47, 53 (1977).

needs of the child, and the expectation of the child that it may look to its father for such care. The Government has thus decreed that a condition of welfare eligibility for a mother is that her child surrender a vital connection with either the father or the mother.

The Court holds that the Government need only show a rational basis for such action. This standard of review has regularly been used in evaluating the claims of applicants for Government benefits, since "a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status." *Weinberger* v. *Salfi*, 422 U. S. 749, 772 (1975). Plaintiff child support recipients in this case, however, are children who wish *not* to receive public assistance, but to continue to be supported by their noncustodial parent. Their claim is *not* that the Government has unfairly denied them benefits, but that it has intruded deeply into their relationship with their parents. More than a mere rational basis is required to withstand this challenge, and, as the following analysis shows, the Government can offer no adequate justification for doing such damage to the parent-child relationship.

## I

### A

The family is an institution "deeply rooted in this Nation's history and tradition." *Moore* v. *East Cleveland*, 431 U. S. 494, 503 (1977). Our society's special solicitude for the family reflects awareness that "[i]t is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id.*, at 503–504 (footnote omitted).[2] As a result, we have long recognized that "freedom of per-

---

[2] See also *Smith* v. *Organization of Foster Families for Equality and Reform*, 431 U. S. 816, 844 (1977) (importance of the family "stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children, as well as from the fact of blood relationship") (citation omitted).

sonal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky* v. *Kramer*, 455 U. S. 745, 753 (1982). See also *Cleveland Board of Education* v. *LaFleur*, 414 U. S. 632, 639 (1974). Therefore, "when the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore, supra,* at 499.[3]

A fundamental element of family life is the relationship between parent and child. As we said in *Lehr* v. *Robertson*, 463 U. S. 248, 256 (1983): "The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility. It is self-evident that they are sufficiently vital to merit constitutional protection in appropriate cases." We have thus been vigilant in ensuring that government does not burden the ability of parent and child to sustain their vital connection. See, *e. g., Santosky, supra,* at 753; *Stanley* v. *Illinois*, 405 U. S. 645 (1972); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923).[4]

"[T]he rights of the parents are a counterpart of the responsibilities they have assumed." *Lehr, supra,* at 257. When parents make a commitment to meet those responsibilities, the child has a right to rely on the unique contribution

---

[3] See also *Griswold* v. *Connecticut*, 381 U. S. 479, 502 (1965) ("[T]here is a 'realm of family life which the state cannot enter' without substantial justification") (WHITE, J., concurring in judgment) (citation omitted).

[4] We have not hesitated to protect this relationship even when it has existed outside the traditional family arrangement. See, *e. g., Caban* v. *Mohammed*, 441 U. S. 380 (1979) (recognizing parental interest of unwed father who had participated in raising his children); *Smith, supra,* at 846–847 (acknowledging fundamental liberty interest of parents whose child had been placed in temporary foster care). These cases reflect appreciation of the fact that the parent-child bond is a fundamental relationship that requires protection regardless, and perhaps especially because, of the misfortune and caprice that inevitably beset human affairs.

of each parent to material and emotional support. The child therefore has a fundamental interest in the continuation of parental care and support, and a right to be free of governmental action that would jeopardize it. As the next section discusses, a child in modern society faces perhaps more difficulty than ever before in sustaining a relationship with both parents.

B

It is increasingly the case that a child in contemporary America lives in a household in which only one parent is present. The percentage of households headed by one parent has doubled since 1970, from 13% to 26%. U. S. Dept. of Commerce, Bureau of the Census, Current Population Reports, Household and Family Characteristics: March 1984, p. 1 (1985) (Current Population Reports).[5] Researchers predict that "close to half of all children living in the United States today will reach age 18 without having lived continuously with both biological parents." Furstenberg, Nord, Peterson, & Zill, The Life Course of Children of Divorce: Marital Disruption and Parental Contact, 48 Am. Sociological Rev. 656, 667 (1983).

Almost 90% of single-parent households are headed by women,[6] and a considerable percentage of them face great financial difficulty. One prominent reason is that divorce "produces a precipitous decline in women's household incomes." Weiss, The Impact of Marital Dissolution on Income and Consumption in Single-Parent Households, 46 J.

---

[5] Almost 60% of all black families with children are headed by one parent, compared with only 36% in 1970. While only 1 in 10 white families were headed by a single parent in 1970, the figure is now 1 in 5. Current Population Reports, at 5.

[6] Families headed by women accounted for 25% of the households added from 1980 to 1984, compared to 18% of the households added from 1970 to 1980. Id., at 2. See also H. Ross & I. Sawhill, Time of Transition: The Growth of Families Headed by Women (1975).

Marriage & Fam. 115 (1984).[7] In 1977, one-half of *all* related children under age 18 in female-headed households were below the poverty level. Espenshade, The Economic Consequences of Divorce, 41 J. Marriage & Fam. 615, 616 (1979). Not surprisingly, many such households must rely on public assistance.[8]

Increasing numbers of children in this country thus reside only with their mother, in a household whose financial condition is precarious. These children have a fundamental interest in sustaining a relationship with their mother, since she is their primary source of daily emotional support. They also have a fundamental interest, of course, in sustaining a relationship with their father, whose absence from the household does not diminish the protection that must be afforded this parent-child relationship. The need for connection with the father is underscored by considerable scholarly research, which indicates that "[t]he optimal situation for the child is to have both an involved mother and an involved father." H. Biller, Paternal Deprivation 10 (1974).[9] Research indicates that maintenance of a relationship with both parents is particularly important for children whose parents have divorced: "By his or her presence or absence, the visiting par-

---

[7] One scholar has found that "when income is compared to needs, divorced men experience an average 42 percent rise in their standard of living in the first year after the divorce, while divorced women (and their children) experience a 73 percent decline." L. Weitzman, The Divorce Revolution 323 (1985).

[8] In May 1982, of all AFDC families, only 9.4% had a father present in the home. U. S. Dept. of Health and Human Services, Findings of the May 1981-May 1982 Aid to Families With Dependent Children Study 3 (1985).

[9] "[P]aternal deprivation, including patterns of inadequate fathering as well as father absence, is a highly significant factor in the development of serious psychological and social problems." H. Biller, Paternal Deprivation 1 (1974). See also Hetherington & Deur, The Effects of Father Absence on Child Development, 26 Young Children 233, 244 (1971) ("Father absence appears to be associated with a wide range of disruptions in social and cognitive development in children").

ent remains central to the psychic functioning of the children." Wallerstein & Kelly, The Father-Child Relationship: Changes After Divorce, in Father and Child: Developmental and Clinical Perspectives 451, 454 (S. Cath, A. Gurwitt, & J. Ross eds. 1982).[10]

In short, "training, nurture, and loving protection . . . are at the heart of the parental relationship protected by the Constitution," *Rivera* v. *Minnich, ante,* at 580, and a child's relationship with a father outside the home can be an important source of these benefits.

## C

The Government's insistence that a child living with an AFDC mother relinquish its child support deeply intrudes on the father-child relationship, for child support is a crucial means of sustaining the bond between a child and its father outside the home. A father's support represents a way in which the father can make an important contribution to raising the child, and the benefits to the child are both financial and emotional.

Financially, child support makes available resources to help meet the child's daily material needs—resources especially important because of the financial difficulties that confront many households headed by women. Child support is also integrally related to the father's ongoing involvement in raising the child. The father is not there on a daily basis to wake the child in the morning, bring him or her to school, answer innumerable questions, offer guidance with personal problems, put the child to bed, and provide the countless doses of encouragement and consolation that daily life requires. Nonetheless, by helping to meet the child's daily material needs, the father can let the child know that the

---

[10] See also Hetherington, Divorce: A Child's Perspective, 34 Am. Psychologist 851, 856 (1979) ("Most children wish to maintain contact with the father, and in preschool children, mourning for the father and fantasies of reconciliation may continue for several years").

father is committed to participating in the child's upbringing. Meals, clothes, toys, and other things made possible by this support represent this commitment even when the father cannot be there to affirm it himself.[11]

The provision of support by a father outside the home therefore constitutes a parent-child relationship founded upon the pledge of the father to provide support that is responsive to the particular needs of the unique child that is the father's own.[12]   Braces, special shoes, lessons—a father may not be able to provide all these things for his child, but he is entitled to try.   The father may not be the custodial parent, available on a daily basis.   Nonetheless, he *is* the child's father, and "[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring.   If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development." *Lehr*, 463 U. S., at 262.

The role of child support in providing a "critical bond" between father and child, Brief for Juvenile and Family Court Judges as *Amicus Curiae* 23, is documented in studies on divorced families.   "[C]hild support is unquestionably one

---

[11] Studies of children of divorce, for instance, indicate that "[c]hildren who were well-supported were significantly less likely to feel rejected by their father."   Wallerstein & Huntington, Bread and Roses: Nonfinancial Issues Related to Fathers' Economic Support of Children Following Divorce, in The Parental Child-Support Obligation 135, 149 (J. Cassetty ed. 1983).

[12] Guidelines for those support obligations that are judicially imposed, for instance, require consideration of the needs of the particular child in question.   See, *e. g.*, Uniform Marriage and Divorce Act, 9A U. L. A. § 309 (1979 and Supp. 1987) (court must consider, *inter alia*, "the physical and emotional condition of the child and his educational needs").   See also Douglas, Factors in Determining Child Support, 36 Juvenile & Fam. Court J., No. 3, p. 27 (1985).

of the major strands in the relationship between fathers and children during the years following divorce." Wallerstein & Huntington, *supra* n. 11, at 135. As one national study concluded:

"The performance of the parental role, especially for males, is linked to the ability to provide material support for the child following marital dissolution. It has been suggested that lower-status males withdraw from the paternal role when they cannot contribute materially to the welfare of the child. [This study provides] evidence that fathers who pay some support are much more likely to see their children on a regular basis." Furstenberg, Nord; Peterson, & Zill, 48 Am. Sociological Rev., at 665.[13]

Thus, aside from its intrinsic importance, child support is a strand tightly interwoven with other forms of connection between father and child. Removal of this strand can unravel all the others.

Through child support, then, children in the increasing number of one-parent families in this country have a means of sustaining a relationship with both parents. The bond with the custodial parent, usually the mother, is forged through daily contact and care. The bond with the parent outside the home, usually the father, is maintained to a significant degree through provision for the child's material needs. In these ways, the family sustains the involvement of both parents in the upbringing of the child as best as the fragmentation of their lives will permit.

Such an arrangement is a hard-won accomplishment, for, sadly, the stresses of separation often result in the effective disintegration of the relationship of the child with the parent

---

[13] If this is the case for the father-child relationship formed after divorce, it is even more true for those relationships out of wedlock. Father and child in those instances do not, as do families of divorce, have available a fund of prior daily association on which to draw in sustaining a parent-child bond.

outside the home.[14]   Many children report only infrequent visits from their fathers, and a large number do not receive the child support payments to which they are entitled.[15]   The father outside the home and his child who sustain a relationship therefore may claim a rare and fragile achievement, for "outside parents who are committed to maintaining a relationship are a special breed and their children recognize it." Furstenberg & Nord, *supra* n. 14, at 903.

## II

The first part of this section describes the infringement on the parent-child relationship produced by the household filing requirement.   The second part demonstrates that the claim presented in these cases differs from the unsuccessful challenges to benefit programs that the Court relies upon to uphold the filing provision.

## A

If a child is living with its mother and receiving support from its father, it is clear that the Government could not terminate either of these relationships without substantial justification.   It could not remove the child from the custody

[14] For children of divorce, for instance, "[m]arital disruption effectively destroys the ongoing relationship between children and the biological parent living outside the home in a majority of families."   Furstenberg & Nord, Parenting Apart: Patterns of Childrearing After Marital Disruption, 47 J. Marriage & Fam. 893, 902 (1985).   In one study, for instance, children with a father outside the home were asked, "When you think about your family, who specifically do you include?"   Virtually all children included the biological parent with whom they were residing, and 72% mentioned their stepfather.   Dishearteningly, however, only half the children included their biological father as a member of their family.   *Id.*, at 899.

[15] "Despite court orders, noncustodial fathers fail to pay $4 billion in child support each year.   More than half (53 percent) of the millions of women who are due child support do not receive the court-ordered support." Weitzman, *supra* n. 7, at 262 (footnote omitted).   See also D. Chambers, Making Fathers Pay (1979); Hetherington, Cox, & Cox, The Aftermath of Divorce, in Mother/Child Father/Child Relationships 149, 163 (J. Stevens & M. Mathews eds. 1978).

of the mother without a compelling reason, and would have to prove its case by clear and convincing evidence to do so. *Santosky* v. *Kramer*, 455 U. S. 745 (1982). The argument that other connections might remain would be unavailing, for the custodial relationship is a vital bond between mother and child.

Nor could the Government forbid the father to support his child without some powerful justification. A father is entitled to support his child, and the child is entitled to look to the father for this support. To prohibit paternal support would deny the father a crucial means of participating in the upbringing of the child, and deny the child its entitlement to receive support from a biological parent who has a deep-rooted interest in seeing that the particular needs of that child are met. The argument that other forms of connection might remain likewise would be unavailing, for a father's support of his own child is integral to sustaining the parent-child relationship.

The intrusion on the fundamental interest in family life in each of these scenarios should be apparent to us all. Yet the Government in these cases has used its economic leverage to achieve exactly the same result. It has told children who live with mothers who need AFDC that they cannot both live with their mothers and receive child support from their fathers. Rather than terminate either relationship itself, the Government requires the *child* to choose between them. It has declared that, for an indigent mother with a child receiving child support, a condition of *her* AFDC eligibility is that *her child* relinquish its fundamental constitutional interest in maintaining a vital bond with either her or the child's father.

On the one hand, if the child stays with its mother, the father is told that henceforth the Government, not he, will support the child. Unless he is wealthy enough to support the entire household, all but $50 of any support payment that the father makes will be used to reimburse the Government for making a welfare payment for use by the whole family. This

conversion of the father's support payment into Government reimbursement means that the father is rendered powerless in most cases to respond to the special financial needs of his child.

It is important to illustrate why this is the case. Let us suppose that a couple with one child obtains a divorce, that the mother has a child by a previous marriage, and that the mother has custody of the two children. The mother has no source of income, but the father from whom she obtained her recent divorce provides $150 a month to support his child. If the mother desires to keep both her children, the $150 in child support must be assigned to the State. In return, the three-person household receives, let us say, $400 a month in AFDC. Of the $150 in child support assigned to the State, $50 is returned for use of the child for whom it was paid, and $100 is kept by the State as reimbursement for its welfare payment.

If the father wanted to increase the amount of child support, say to $200, because of the child's special needs, *none of the extra money would go to the child*. The family would still receive $400 in AFDC, and the child would still receive $50 of the support payment. The only difference would be that the State would now get to keep $150 as reimbursement for the welfare payment. By continuing to live with the mother, the child has lost not only the financial benefit of the father's support, but a father-child relationship founded on the father's commitment to care for the material needs of his child. If the child has a conscientious father who has shouldered his paternal duty, that father will be enlisted to help defray the cost of providing for *other* children whose fathers are not so responsible. A child thus must pay a high price for continuing to live with its mother.

This price is not merely speculative. The affidavits in these cases establish it. Diane Thomas, for instance, has two children, Crystal, aged 9, and Sherrod, aged 7. App. to Juris. Statement 22a. Although she has sought gainful employ-

ment, she has been unable to find work. Crystal's father has almost never complied with a court order requiring him to contribute to Crystal's support. Sherrod's father, however, has voluntarily paid $200 a month on a regular basis toward Sherrod's support. Prior to October 1984, Ms. Thomas received $194 a month in AFDC for the support of herself and Crystal. In October, she received a notice that if she did not file an AFDC application for Sherrod and assign his child support to the State her assistance would be terminated. She then applied for benefits for herself and both her children, assigning Sherrod's child support rights to the State. Because the child support is now regarded as the income of the whole household, the AFDC grant has been reduced to $73 a month. Whereas Sherrod formerly had been entitled to $200 a month in support, he is now entitled to one-third of the $273 total income attributed to the household, or $91, and to $50 of his father's monthly support check assigned to the State, for a total of $141. The financial cost to Sherrod of staying with his mother is thus $59 a month.

Sherrod has paid an emotional price for continuing to live with his mother as well. Two months after the household began receiving welfare, Sherrod's father began to withhold support payments. Ms. Thomas stated: "He informed me that as long as I was going to use Sherrod's support money to keep up my daughter Crystal, he would continue to withhold the support." *Id.*, at 25a. Furthermore, he has not visited Sherrod since beginning to withhold support payments. As Ms. Thomas stated, "[Sherrod's father] is extremely opposed to his son being on welfare benefits, and has told me that he stopped seeing his son because I now receive AFDC for Sherrod." *Id.*, at 26a. Sherrod, of course, has no control over any of this, but nonetheless must suffer the loss of his father's care:

> "Sherrod is very upset that his father no longer visits him. He frequently asks me why his daddy does not come to see him anymore. Since the time his father has

stopped visitation, Sherrod has begun to wet his bed on a frequent basis. Also since the visitation stopped, Sherrod has become much more disruptive, especially in school. Furthermore, his performance in school seems to have declined." *Id.*, at 26a–27a.[16]

The testimony at trial in this case sheds some light on the reactions of fathers such as Sherrod's. Professor Stack of Duke University testified:

"A law that tells fathers that their efforts cannot keep their children off the welfare rolls, or that what they can provide is not good enough, challenges the efforts and integrity of good men and fathers. Feelings of anger, frustration and shame are not inappropriate or unexpected. The anger is sometimes vented at children, sometimes at mothers, more often both." *Id.*, at 82a–83a.

North Carolina District Judge Hunt also testified about her experience in dealing with fathers who have an obligation to provide child support:

"Many of these fathers grew up on welfare and they are very sensitive to . . . the lack of a father involved in their lives. They know and understand the pride the child feels when he or she can say 'my daddy supports me.' These fathers know firsthand that the children will grow up knowing that they are on welfare and that their mothers depend for support on a check each month from the Department of Human Resources and that food stamps buy the groceries. It isn't the same as financial and emotional support from your own father." *Id.*, at 84a.

The reaction of Sherrod's father may be misguided. It may be that he should overcome the obstacles the Govern-

---

[16] While Sherrod's father may be criticized, he is under no judicially imposed obligation to pay support. The record thus contains more than mere "evidence that a few noncustodial parents were willing to violate the law by not making court-ordered support payments." *Ante*, at 599.

ment has placed in his way, and still maintain some form of involvement in Sherrod's life. The point, however, is that he should not have to try.

The financial and emotional cost of losing this connection with the father may be too much for the child to bear. If so, the only way to avoid it is for the child to leave the custody of the mother. This price for continuing to receive support from the father also is not speculative. At least one of the families in this case has chosen this course. Mary Medlin has four children, one of whom, Karen, receives $200 in child support from her father, and another of whom, Jermaine, receives $50 in support. *Id.*, at 27a–28a. Ms. Medlin originally received $223 in AFDC for herself and her two other children. When, as required, she added Karen and Jermaine to the welfare rolls, her entire family became ineligible for AFDC. In order to obtain assistance for her family, she agreed to relinquish custody of Karen to her father. *Id.*, at 29a.

Karen may now keep her $200 in child support, and her mother may now obtain AFDC for herself and her other children. They may no longer, however, live in the same household. The burden of their choice hardly requires elaboration. "Continuity of relationships, surroundings, and environmental influence are essential for a child's normal development." J. Goldstein, A. Freud, & A. Solnit, Beyond the Best Interests of the Child 31–32 (rev. ed. 1979).[17] The relationship between the child and the custodial parent is a bond forged by intimate daily association, and severing it unalterably transforms the parent-child relationship. It may be that parent and child will be able to fashion some type of new relationship; even if they do, however, each has lost something of incalculable value.

It is thus clear that in these cases the Government " 'directly and substantially' interfere[s] with family living arrange-

---

[17] See also Bowlby, Attachment and Loss: Retrospect and Prospect, 52 Am. J. Orthopsychiatry 664, 666 (1982).

ments and thereby burden[s] a fundamental right." *Lyng* v. *Castillo*, 477 U. S. 635, 638 (1986), quoting *Zablocki* v. *Redhail*, 434 U. S. 374, 387 (1978). The infringement is direct, because a child whose mother needs AFDC cannot escape being required to choose between living with the mother and being supported by the father. It is substantial because the consequence of that choice is damage to a relationship between parent and child. Furthermore, the Government has created an inherent conflict between the interests of the father and the mother. As the record in these cases testifies, a typical father will feel strongly that his son should be supported by him and not by public assistance. The typical mother will feel that loss of the father's support is a price worth paying to keep the child with her. The child may well be swept up in a custody dispute over which living arrangement is in its best interest, especially given the recent trend toward easier modification of custody arrangements. See Wexler, Rethinking the Modification of Child Custody Decrees, 94 Yale L. J. 757, 760–782 (1985). In short, the Government has sliced deeply into family life, pitting father against mother, with the child in the middle.

### B

The nature of the interest asserted in these cases, as well as the direct disruption produced by the Government, distinguishes this litigation from typical challenges to the operation of Government benefit programs.

First, unlike those cases on which the Court relies, plaintiff children receiving child support do *not* assert that they have been unfairly denied a Government benefit. Rather, they claim that the Government has deeply intruded on their relationships with their parents. In *Weinberger*, we directly acknowledged the difference between these two types of claims: *"Unlike the claims involved in* Stanley *and* LaFleur, a noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status." 422 U. S.,

at 771–772 (emphasis added). The children in these cases obviously present claims based on the constitutionally protected interest in family life involved in *Stanley* and *LaFleur*. Their claims thus must be met by more than a mere demonstration that there is some plausible basis for the Government's action.

This leads to a second point. We are willing to accept the validity of many conditions on participation in Government programs because this Court has never held that anyone has an absolute right to receive public assistance. The Court has thus assumed that participation in a benefit program reflects a decision by a recipient that he or she is better off by meeting whatever conditions are attached to participation than not receiving benefits. In assessing the burdens imposed by a program, then, the theory has been that whatever reasonable burdens are borne by the recipient are willingly assumed. Thus, for instance, if a child, through its mother, voluntarily wishes to participate in the AFDC program, the requirement that child support be assigned to the State is one of the conditions to which a recipient is deemed to have freely consented. See 42 U. S. C. § 602(a)(26) (1982 ed., Supp. III).

In these cases, however, the burden placed on the child is not the result of his or her voluntary application for AFDC benefits. Indeed, participants in this litigation are children who do *not* wish to receive AFDC. Rather, the child must choose between the father and mother solely because *other* household members are indigent and desire public assistance. It is the presence of *these* persons in the household, not the child's voluntary application for public assistance, that triggers the requirement that it choose which parental relationship to maintain.

The Government has thus placed a burden on the child's fundamental interest in a relationship with both parents on the basis of a factor over which the child has no control. What we said with respect to illegitimacy in *Weber* v. *Aetna*

*Casualty & Surety Co.*, 406 U. S. 164, 175 (1972), is equally applicable here: imposing such a burden "is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as unjust— way of deterring the parent." See also *Trimble* v. *Gordon*, 430 U. S. 762, 770 (1977) (children "can affect neither their parents' conduct nor their own status"). The paradigm of the willing AFDC participant is inapplicable in this case, for the child's fundamental rights are infringed so that *other* members of the household can receive the assistance that *they* desire. In insisting that the mother use one child's support to purchase AFDC for other household members, the Government ignores our pronouncement in *Prince* v. *Massachusetts*, 321 U. S. 158, 170 (1944): "Parents may be free to become martyrs themselves. But it does not follow that they are free . . . to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves."

Finally, the disruption directly produced by the household filing requirement distinguishes these cases from cases in which we have upheld Government benefit provisions from a challenge that they interfered with family life. In *Lyng, supra,* for instance, we upheld the food stamp program's presumption that parents, children, and siblings who live together constitute a single "household," so that such persons could not individually apply for benefits as separate households. We noted that the definition "does not order or prevent any group of persons from dining together. Indeed, in the overwhelming majority of cases it probably has no effect at all." *Id.,* at 638. In *Califano* v. *Jobst*, 434 U. S. 47 (1977), we upheld a provision whereby a recipient of dependent Social Security benefits lost those benefits upon marriage to anyone other than another beneficiary, even though we acknowledged that the provision "may have an im-

pact on a secondary beneficiary's desire to marry, and may make some suitors less welcome than others." *Id.*, at 58. These cases reflect recognition that the extensive activities of Government in modern society inevitably have the potential for creating incentives and disincentives for certain behavior. By itself, plausible speculation about the effect of Government programs generally cannot provide the basis for a constitutional challenge.

In these cases, however, the impact of Government action is not speculative, but direct and substantial. If a child support recipient lives with a mother who needs public assistance, AFDC will be provided *only* if the child either leaves the household or gives up its right to support from its father. Determining whether other eligibility requirements for Government assistance will influence family choices may call for subtle inquiry into the nuances of human motivation. Here, however, the burden on family life is inescapable, because it is *directly required* by the Government as a condition of obtaining benefits. "'Governmental imposition of such a choice puts the same kind of burden upon [the child's rights] as would a fine imposed against'" the child for living with its mother or being supported by its father. *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 140 (1987) (citation omitted).

The Court contends that applying heightened scrutiny in this case would jeopardize AFDC's general requirement that AFDC be available only to families without two resident parents, *ante*, at 602, n. 17. Assuming, *arguendo*, that the latter provision would not elicit heightened scrutiny, it is distinguishable from the one at issue in these cases. Since the regulation in these cases applies *only* to households in which a child support recipient lives, we know that a condition of AFDC eligibility for every household covered by the regulation is that a child choose between parental relationships. We thus know that this eligibility provision will intrude on family life in every case in which it is applicable. We cannot

say the same of a general eligibility provision, such as the requirement that AFDC be given only to families without two resident parents. Many households will be able to obtain AFDC without any intrusion on family life, since they would only have one parent present in any event. Our speculation that the single-parent requirement *might* affect the family decisions of *some* households to which it applies is thus far different from our certainty that the support assignment requirement *will* affect the family decisions of *every* household to which it applies.

The contention in these cases is therefore that the Government as a condition of AFDC eligibility will inevitably burden the fundamental interest of a child in maintaining a custodial relationship with its mother and a support relationship with its father. Such a burden must be justified by more than a mere assertion that the provision is rational.

## III

Turning first to the Government's purpose in enacting the provision at issue in these cases, the Government urges that the change in the household filing requirement was meant to be a "rational means of carrying out Congress's conclusion that families whose members have access to additional sources of income have less need for government assistance than families without access to such income." Brief for Federal Appellant 41.

This concern for program efficiency is certainly a valid objective, and serves to justify governmental action in most cases. It cannot in itself, however, provide a purpose sufficiently important to justify an infringement on fundamental constitutional rights. If it could, its reach would be limitless, for it is probably more efficient in most cases for Government to operate without regard to the obstacles of the Constitution than to attend to them. Nonetheless, "the Constitution recognizes higher values than speed and efficiency." *Stanley*, 405 U. S., at 656. It is true that Congress could, if

it chose, completely eliminate the AFDC program in order to save money, for this Court has held that no one may claim a constitutional right to public assistance. Having chosen to operate such a program, however, it may not invoke the efficiency of that program as a basis for infringing the constitutional rights of recipients. See, *e. g.*, *Shapiro* v. *Thompson*, 394 U. S. 618, 633 (1969) (in equal protection context, "[t]he saving of welfare costs cannot justify an otherwise invidious classification"). Surely no one could contend, for instance that a concern for limiting welfare outlays could justify mandatory sterilization of AFDC beneficiaries, or the forfeiture of all personal possessions. "Indeed," as we have said:

> "one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones." *Stanley, supra,* at 656.

Thus, the Government's desire to target AFDC payments more efficiently cannot in itself serve to justify infringement of the child's fundamental interest in living with its mother and being supported by its father. Even if a concern for program efficiency could serve as a sufficiently important objective in this context, however, the Government need not infringe upon family life in order to accomplish it.

It may well be unrealistic to assume that *no* child support is available as a common household resource, given the fact that a child enjoys such common benefits as shelter, utilities, and food. It is thus reasonable to account for the reality of household living by assuming that a portion of the child support payment is used to meet the child's share of these common expenses. Thus, the Government could regard as household income that portion of the support payment that represents the child's pro rata share of common expenses. This calculation could be done easily for each household size,

and would require no case-by-case determinations. Such attribution of income would require no pre-emption of state child support law, since the use of support payments to meet the child's share of such common expenses is consistent with state-law requirements that child support be used solely for the benefit of the child.[18]

At the same time, such a provision leaves intact the father-child support bond. In making a commitment to meet the particular needs of his child, the father surely realizes that some of those needs are common needs for which it is only fair to seek a contribution from the child. This is far different, however, from assuming that the *entire* child support payment is available for the whole household. The father's unique relationship is with his child, not with other members of the household, and the father and child, not the Government, should be the ones to decide if it should continue.

If the Government is concerned that some mothers may be violating their fiduciary duty to their child by using the support payment for all household members, it could easily require as a condition of AFDC participation that the mother account for the use of child support money. If the money is in fact being used for everyone, the father is not simply supporting his child, but everyone, so that the child has no special parental support relationship different from any other child in the household. In that case, it is fair to require the assignment of child support to the Government, since this requirement does not represent the child's relinquishment of a distinctive father-child bond. The assignment provision in

---

[18] See, *e. g.*, N. C. Gen. Stat. § 50–13.4(d) (1984) (child support payments for minor child must be paid to custodian "for the benefit of such child"). See also *Goodyear* v. *Goodyear*, 257 N. C. 374, 379, 126 S. E. 2d 113, 117 (1962) (parent is trustee for children who receive support, and may use payments only "for the benefit of [these] children"). It is true that benefits to other household members may redound to the benefit of the child. There must be some limit to such attribution of benefits, however, if we are to adhere to our tradition that the welfare of the individual is not completely reducible to the welfare of the group.

such an instance does no more than reflect the family members' own decision about how the child support should be used. It may be that the accounting will inform the father that the money is being used against his wishes, so that he will demand that it be used for his child. Families may resolve this disagreement in various ways, but the resolution will reflect the decision of the parents, not the Government, as to the best way to meet the needs of the child.

If an accounting revealed that some, but not all, of the support were used for the needs of other household members, the Government would be free to attribute this amount as household income, and to require the assignment of some representative portion of the support payment. That portion used or saved for the child's special needs, however, could not go to the Government, for it represents the father's commitment to meeting the particular needs of his child. These funds may be used to permit the child to pursue a particular interest, to help defray the cost of special training necessary because of a learning disability, or to save for the child's education. Whatever the use to which the money is put, the child knows that it may look to its father for it. The allocation of the support payment between the needs of the child and those of other household members represents the decision of family members, not the Government, as to how best to raise the child.

Finally, to the extent that Congress sought to give recognition to the fact that individuals living together enjoy some economies of scale, *ante*, at 599, this could be addressed far less disruptively. The Government need only require that the child support recipient be included in the calculation of household size. Since per capita AFDC payments are lower the larger the household, this measure would accomplish the Government's end while not intruding on the parent-child relationship.

The Government's justification for its direct and substantial infringement on parent-child relationships thus falls

short.   As salutary as a desire for cost-effective program management may be, alone it is not a purpose of adequate magnitude to warrant such infringement.   Even if it were, the Government need not abandon its desire to target AFDC more efficiently in order to avoid direct intrusion into the intimate domain of family life.   Measures are available that would achieve a more realistic consideration of household income while still permitting a child to sustain vital bonds with both its father and mother.   As a result, the household filing requirement cannot withstand constitutional scrutiny.   This conclusion does not represent an effort to second-guess Congress as to the most effective use of its funds, nor does it represent a threat to the discretion that program officials must inevitably exercise.   Rather, it reflects adherence to the principle that on those occasions that the Government deeply and directly intrudes on basic family relationships, there must be a powerful justification for doing so.

## IV

In The Republic and in The Laws, Plato offered a vision of a unified society, where the needs of children are met not by parents but by the government, and where no intermediate forms of association stand between the individual and the state.   2 The Dialogues of Plato 163 (B. Jowett transl. 1953); 4 *id.*, at 189.   The vision is a brilliant one, but it is not our own:

> "Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution." *Meyer*, 262 U. S., at 402.

If we are far removed from the Platonic Republic, it is because our commitment to diversity and decentralized human

relationships has made us attentive to the danger of Government intrusion on private life. Those who are affected by the Government in these cases are fathers and children who have sustained a relationship whereby the child is supported by the father, not dependent on the State. The State has told the child that if it is to live with a mother not so fortunate, it too must become a dependent of the State. If it does so, the child's material needs will no longer met by a father's attention to his particular child. Rather, the child will be one of many who are supported by the Government, and the father, powerless to direct assistance to his child, can only reimburse the Government for supporting the entire household. Such an arrangement calls to mind Aristotle's criticism of the family in Plato's Republic: "[E]ach citizen will have a thousand sons: they will not be the sons of each citizen individually: any and every son will be equally the son of any and every father; and the result will be that every son will be equally neglected by every father." The Politics of Aristotle 44 (E. Barker transl. 1958). Regardless of the benevolence with which it is issued, a Government check is no substitute for the personal support of a loving father.

"Happy families," wrote Tolstoy, "are all alike; every unhappy family is unhappy in its own way." L. Tolstoy, Anna Karenina 1 (C. Garnett transl. 1978). Contemporary life offers countless ways in which family life can be fractured and families made unhappy. The children who increasingly live in these families are entitled to the chance to sustain a special relationship with both their fathers and their mothers, regardless of how difficult that may be. Parents are entitled to provide both daily emotional solace and to meet their child's material needs; the fact that in some families a different parent may take on each role does not diminish the child's right to the care of both parents. The Government could not prohibit parents from performing these duties, and what it cannot do by direct fiat it should not be able to do by economic force. The Government has decreed that the only

way a child can live with its mother and be supported by its father is if the mother is wealthy enough not to require public assistance. A child cannot be held responsible for the indigency of its mother, and should not be forced to choose between parents because of something so clearly out of its control. No society can assure its children that there will be no unhappy families. It *can* tell them, however, that their Government will not be allowed to contribute to the pain.

I dissent.

JUSTICE BLACKMUN, dissenting.

I am in general agreement with much of what JUSTICE BRENNAN has said in Parts I, II, and III of his opinion. I therefore also dissent from the judgment of the Court.