630 A.2d 438

**Joell SANDERS/DPA, Appellants,**

**v.**

**Vertis LOTT, Appellee.**

Superior Court of Pennsylvania.

Argued March 3, 1993.

Filed Aug. 12, 1993.

120

Joan Esmonde, Asst. Dist. Atty., Philadelphia, for appellants.

Before CAVANAUGH, BECK and HUDOCK, JJ.

CAVANAUGH, Judge:

This case involves a *sua sponte* adjudicatory attempt to realign the import of our Child Support Guidelines and Federal Regulations concerning the payment of child support to children on welfare. The current way of treating the support of children whose custodial parent is on welfare embodies certain judgments as to what best fulfills the relevant social and economic goals of our society. The lower court order improperly attempts to change the current methodology and replace it with a practice it believes is more efficacious. We must conclude that the court's calculation of the support award was in error. Accordingly, we reverse.

This case arose out of a claim for child support by Ms. Joell Sanders filed on August 23, 1991. The father, Vertis Lott, acknowledged paternity of the child in March, 1991. On January 22, 1992, both parties appeared before the Permanent Hearing Officer. The Permanent Hearing Officer apparently applied the guidelines correctly, determining, *inter alia*, that

the mother had no earnings or earning capacity and the father earned a monthly net income of $1,778. The Permanent Hearing Officer, based on his calculations and his application of the guidelines, determined that $82.13 per week was the proper amount for the father to pay in support. The father filed exceptions to the Hearing Officer's recommendation.

Argument was heard on these exceptions on March 9, 1992, before the Hon. Stephen E. Levin. At no point did the lower court challenge the accuracy of the Permanent Hearing Officer's calculation or point out an error in the Permanent Hearing Officer's application of the guidelines. Nonetheless, Judge Levin reduced the Father's support award approximately fifty (50%) percent, to $42.00 per week. At the hearing, he justified his action as follows:

THE COURT:

I am not going to belabor it, because I am going to grant your exceptions, but I want you to understand the tragedy that has occurred here. I think your client does.

We do not have the ability, although I think we should, to order that this child be removed from welfare. I have often thought, district attorney, that what we should be allowed to do in cases like this is order this child removed from the grant, and, unfortunately, I used to try to do that and I have given up.

MS. ESMONDE:

You can't remove one child—

THE COURT:

I am aware of that.

MS. ESMONDE:

—if others remain.

Yes.

THE COURT:

This father should be entitled to provide for that child directly to this mother and not pay through the Department of Welfare. Now, I cannot do that. That is one solution that, unfortunately, I am blocked from using, which would

be the appropriate solution in my personal view, but not as a judge. I cannot do it.

The other solution, in the long run, sir, is, at some point, you should consider being very active in this child's life and seeing if you can remove the child from the mother, because that would probably be the only way you are going to influence this child in a way that is positive.

As far as this Order is concerned, I will change the Order—all right?—because my own view is, this is providing the Department of Public Assistance with more money by a very significant amount than they are laying out for this child.

What I have done, counsel, just so you will understand it, in reaching my calculation, I have assumed that the actual cash grant that is being laid out is somewhere around $1100. I have further assumed that there will be a pass through of $600 to the mother. That is the $50 a month. I am assuming that the department is laying out at least the six hundred, no matter what we do; the eleven hundred, no matter what we do.

I am further assuming that the department will not have medical costs for the child, because I am ordering the father—I am changing the portion of that Order where it says, "when available."

I am ordering that the child be covered by the father, and I am putting on the Order that we are advised that the child is presently covered by the father.

Now, having done those two things, I think there is still one additional sum that the department lays out, in addition to that, which is a food stamp amount, which I have difficulty calculating, because I do not know the accurate amount.

MS. ESMONDE:

Your Honor, if I could just get clear one point, the medical coverage, does that cover one hundred percent of the child's needs, because if it doesn't cover well-baby care and things of that nature, the Department of Public Assis-

tance and the taxpayers of the Commonwealth will be picking up that cost, without a reimbursement from the defendant?

THE COURT:

I will inquire.

What does it cover, sir?

MR. McDANIEL:

Your Honor, he has two coverages. He has a city health plan, because he works for the City, so that's full, as well as the government, which there would be an overlap. So—

THE COURT:

Is there an HMO with the City, sir?

MR. LOTT:

Yes, sir. There is.

THE COURT:

O.K. Then the mother has available complete coverage, counsel.

MR. ESMONDE:

Thank you, Your Honor.

THE COURT:

Complete coverage, all right.

I am going to make the Order, and I am being very quite honest with both of you, so you understand how I am doing it. I am going to add $500 above that absolute minimal, that seventeen hundred, that is being laid out, and the Order will be approximately $2200 per year.

MS. ESMONDE:

Your Honor, if I could just make an argument for the record.

THE COURT:

Well, wait. Let me just—

MS. ESMONDE:

Oh. I'm sorry.

THE COURT:

So it is right—

MS. ESMONDE:

I thought you were finished.

THE COURT:

—I am just showing both of you how I am calculating it out.

Although the guidelines—and you will have a chance to argue against what I am going to do. My thinking, right now, is, although the guidelines would work out to $83, that would be inappropriate, because it would actually be giving the department money that it is not expending, and that a fair Order would be in the range of $42 a week, which would completely reimburse the department and provide the mother with a six hundred-dollar pass through.

Now, counsel, you know how I got it. I have put the $1100 cash, the six hundred-dollar pass through and I have added $500, to include any incidental expenses that the department might have.

You may argue.

MS. ESMONDE:

Your Honor, welfare is merely the assignee of this Order. At some point in the future, if the plaintiff goes off cash assistance from welfare, which you can neither assume that she will or assume that she won't, but she might, she is entitled to the amount of money that welfare has received but, yet, has not paid out.

So you are talking about halving her Order and, at some point in the future and in the child's future, that money, which she would have, otherwise, been entitled as a credit from the Department of Welfare, you're wiping that out, and some fund, in the future, that the child may receive is, by this action, being wiped out.

That is putting her and the child in what I would see as a constitutionally impermissible class, based on their wealth or lack thereof.

THE COURT:

It is an interesting argument and it is a sound argument and it is one that I would appreciate.

However, I will factually determine that a mother who has had seven children or eight now at twenty-four years of age is so irresponsible that the possibility of her going off welfare is non-existent, unless she dies.

Next case.

The argument is proper—

MR. McDANIEL:

Thank you, Your Honor.

THE COURT:

—but, factually, it is not proper, not this lady, but I commend you on the argument, because you are right—

MS. ESMONDE:

I know.

THE COURT:

—O.K.?—but not factually.

MS. ESMONDE:

We'll see.

THE COURT:

Not factually.

You know, sir—Mr. McDaniel, I want you to hear it—I often tell very young men who come in here, kids who are twenty, twenty-one years of age, who have gotten involved with someone who has a procession of children, that they should have known better, because, when they had intercourse with this lady, they knew that there was a risk that she would do this thing.

You, sir, knew better, and I am sorry that this happened to you. I am sorry for the child, but, quite frankly, you did know better—.

MR. LOTT:

Yes, sir.

THE COURT:

—O.K.?

MR. McDANIEL:

Thank you, Your Honor.

\*     \*     \*     \*     \*     \*

(Whereupon, the hearing concluded.)

Thus, it appears that without argument, much yet suggestion, from either party, the court decided to (1) modify father's support award to reflect the amount DPA pays to the mother in welfare and (2) conduct an armchair calculation of a modified award.

Appellant makes two claims of error before this court: (1) the trial court erred in failing to apply either the Support Guidelines or the *Melzer* formula in determining the child's reasonable needs and (2) the trial court erred in basing its calculations and conclusions of the support award on its own guesses and suppositions, rather than any evidence presented. We agree with the tenor of both arguments, for the reasons articulated *infra.*

Appellant's first argument is that the court erred in failing to apply either the Support Guidelines or the Melzer formula in determining the child's reasonable needs. Appellant argues that the court's finding that the mother's receipt of cash assistance constituted an "extraordinary circumstance" to deviate from the guidelines is erroneous and a vehicle for to evade the requirements of the guidelines. We agree.

Before proceeding with the present analysis, it is pertinent to note this is apparently not the first time the judge below has employed this dispositional scheme. *See DPW ex rel. Dessus v. Chamberlain,* 421 Pa.Super. 137, 617 A.2d 762 (1992).

In *Chamberlain, supra,* a panel of this Court had before it the decision of Judge Levin to reduce another support order by 50%, from $71.00 per week to $71.00 bi-weekly, based on the same rationale that is presently before us. In that case, we remanded without considering the merits of the appeal. We reasoned as follows:

The trial court acknowledged that this case involves significant issues of law and social policy, which the court decided without benefit of briefs or oral argument. We agree that a

more extensive illumination of the issues presented by this appeal is warranted.

*Id.* at 141, 617 A.2d at 764. Although we believe that the court has made a better attempt at fleshing out what it considers the relevant issues than in *Chamberlain,* we are troubled by the fact that the court has impermissibly acted based on its own conception of social policy and in derogation of the controlling law.

Our Commonwealth's law relating to support awards is as follows. There exists a rebuttable presumption that the amount of award which would result from the application of the guidelines is the correct amount of support to be awarded. 23 Pa.C.S.A. § 4322(b); Pa.R.C.P. 1910.16–1(b). This presumption is so strong that a written explanation is required when there is a deviation from the guidelines. *Id.; See also Stanton v. Petersen,* 413 Pa.Super. 470, 605 A.2d 819 (1992). In deciding whether to deviate from the amount of support determined by the guidelines, the trier of fact shall consider:

(1) unusual needs and unusual fixed obligations;

(2) other support obligations of the parties;

(3) other income in the household;

(4) ages of the children;

(5) assets of the parties;

(6) medical expenses not covered by insurance;

(7) standard of living of the parties and their children; and

(8) other relevant and appropriate factors, including the best interest of the child or children.

It is readily apparent that the mother's earning capacity is "0.00" under the guidelines. The trial court found that the mother was on Public Aid and had no chance in the foreseeable future of attaining a job. Moreover, the trial court specifically adopted the amount of net income assigned to both mother and father by the Permanent Hearing Officer and acknowledged the accuracy of his determinations. Accordingly, the Permanent Hearing Officer's determination of support was in accordance with the guidelines and entitled to a rebuttable presumption of being correct.

128

■ The question, therefore, is whether the receipt of Public Aid can be considered one of the eight enumerated factors to deviate from the guidelines. It is not for us to speculate that our rules regarding child support were drafted in ignorance of the fact that many fathers would be paying child support to mothers on Public Aid. We note that even though "income" for the purposes of support action is defined broadly, the receipt of Public Aid is not considered to be income. The definition of "income" for support purposes appears in 23 Pa.C.S.A. § 4302 and reads as follows:

"**Income.**" Includes compensation for services, including, but not limited to, wages, salaries, fees, compensation in kind, commissions and similar items; income derived from business; gains derived from dealings in property; interest; rents; royalties; dividends; annuities; income from life insurance and endowment contracts; all forms of retirement; pensions; income from discharge of indebtedness; distributive share of partnership gross income; income in respect of a decedent; income from an estate or trust; military retirement benefits; railroad employment retirement benefits; social security benefits; temporary and permanent disability benefits; workman's compensation and unemployment compensation.

A review of the definition of income indicates that Public Aid is not one of the items enumerated as income. We believe that this can lead to the conclusion that the legislature considered that Public Aid should not be considered as income. Therefore, the trial court's decision to consider the receipt of public aid an "unusual circumstance" for deviating from the support guidelines is error, and appears to be a backdoor method of considering something that the legislature believed should not be considered.

The court's decision appears to be in derogation also of federal law. The trial court ruled presently that the actual need of a child whose mother receives Public Aid is self-determined by what DPA allots to the child for assistance. Its rationale for deviating from the guidelines in this instance is that federal law unwisely mandates that if DPA collects

more support for a particular child than it pays out in direct assistance for that child, it can apply any excess monies to reimburse monies owed to DPA for other family members. *See* 42 U.S.C. § 602(a)(38); 45 CFR § 206.10(a)(1)(vii) (1986). Accordingly, the lower court viewed this case as presenting the problem that a father's contributions would potentially only reduce the debt owed to the state by Mother and all other fathers of her children. The court cited in its opinion the Dissenting Opinion in a Supreme Court case for recognition of this apparent problem. *See Bowen v. Gilliard,* 483 U.S. 587, 619–20, 107 S.Ct. 3008, 3027, 97 L.Ed.2d 485, 513 (1987) (Brennan, J., Dissenting). The trial court has been quite candid that absent this federal practice, it would not reduce the amount of the father's award. In fact, the court said it would modify the award back up to $82.15 if the mother was off welfare and no longer had to reimburse the federal government.

The court felt the need to rectify this alleged injustice perpetrated by federal law. We find troubling, however, that the court ignored the *Majority Opinion* which held that there were several legitimate reasons for this practice and consequently the practice was Constitutional. *Gilliard, supra* at 600, 107 S.Ct. at 3016, 97 L.Ed.2d at 500. Among those reasons was the assumption that child support payments are typically used for an entire family's needs. *Gilliard, supra* at 600 n. 14, 107 S.Ct. at 3016 n. 14, 97 L.Ed.2d at 500 n. 14. Underpinning much of the Majority Opinion in *Gilliard* was a deference to the province of the legislative branch, in that "the intractable economic, social, and even philosophical problems presented by the public welfare assistance programs are not the business of this Court." *Id.* at 609, 107 S.Ct. at 3021, 97 L.Ed.2d at 506, *quoting Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491, 503 (1970). Neither should it be the business of lower state courts, including this court.

We also find merit with the tenor of appellant's second argument, and rely on it as an independent basis for reversal. The appellant argues that the court's calculations of a support

award were seriously flawed, chiefly based upon self-generated estimates that the court placed into the record. She alleges that the trial court's conclusions about the apportionment of the mother's welfare grant was a wild guess at best, as was the court's assignment of a monetary value to mother's food stamps and medical benefits.

We agree with the tenor of appellant's argument. Although we believe, as indicated *supra*, that the lower court provided in the current Record a better indication of how the support award was calculated than in *Chamberlain*, we believe its pronouncements reflect the fact that neither party was prepared to provide figures to calculate a support award that was in line with the court's enthusiasm for equating an award with the actual money the government provided for a child. We are particularly concerned that when neither party could tell the court how much food stamps a family of seven would get, he literally guessed that $500 a year in stamps would be spent on the child. No information appears in the Record as to how he reached this figure. Additionally, we believe that the whole concept of figuring out how much one child receives from DPA by looking at the increase in monthly benefits resulting from an additional family member may be flawed. DPA decreases the amount of money awarded for each additional child, reflecting the belief that it is less expensive to raise each successive child. Therefore, DPA has a "family" concept of determining the cost of raising children. The court, however, viewed the costs of raising a particular child as the additional money which DPA provides for each child.

Accordingly, for the foregoing reasons, the court erred. It has undoubtedly invaded the province of our national and state legislatures. The impact of Judge Levin's practice, if adopted on a more widescale basis, could well be a marked increase in the amount of federal expenditures for AFDC. *Gilliard, supra*, 483 U.S. at 599, 107 S.Ct. at 3016, 97 L.Ed.2d at 499 (challenged practise estimated would save $455 million during fiscal years 1984 through 1987).[1] We acknowledge that a

1. It is important to note that a father is not paying any more under this practice than he would be if the child was not under public assistance.

problem could be perceived in support cases such as this that may call for a legislative response. *See Gilliard, supra* at 619–20, 107 S.Ct. at 3027, 97 L.Ed.2d at 513 (Brennan, J., Dissenting). Notwithstanding, if relief is to come, it must come from our national or state executives or legislators. We would conclude that the trial court's not unpraiseworthy efforts were contrary to the law and authorities which bind us all.

For the foregoing reasons, we reverse.

Case remanded for proceedings consistent with this Memorandum. Jurisdiction relinquished.

HUDOCK, J., files a dissenting statement.

HUDOCK, Judge, dissenting.

Respectfully, I dissent. I disagree with the majority's conclusion that the receipt of public aid can never be an "unusual circumstance" which permits deviation from the support guidelines. The majority suggests that, because the definition of income as found in 23 Pa.C.S. § 4302 does not include public aid as one of the items enumerated, to consider the receipt of public aid as an unusual circumstance for purposes of deviating from the support guidelines is to promote a backdoor method of considering as income something that the legislature believed should not be considered. This reasoning, I respectfully suggest, is flawed, as the note to Pa.R.C.P. 1910.16–4(a) clearly states that a deviation from the support guidelines applies to the amount of the support obligation and not to the amount of the income. The court found that no matter what support obligation was reached, the most the child could actually receive was $50/per month due to the family's receipt of public aid. In considering this factor, the trial court did not attribute an income which was equivalent to the amount of the public aid to the mother. Rather, the court

"The assignment shall be effective only up to the amount of AFDC/GA received." 55 Pa.Code § 187.21(b). In fact, Judge Levin's practice appears to have the perverse result that many fathers of children whose mothers are on public aid are receiving a break from what they ordinarily would have to pay in support.

merely found that, due to the receipt of public aid, an exact calculation of the child's needs would be superfluous. Thus, the trial court's consideration of the mother's receipt of public aid as an unusual circumstance does not equate with the consideration of public aid as income, as the majority suggests. The trial court, on the contrary, adopted the amount of net income assigned by the hearing officer to both mother ($0.00) and father ($1,778 monthly), acknowledging the accuracy of such determinations. From these figures, it determined that there existed an obligation on the part of the father to pay support ($82.13 weekly). At this point, a rebuttable presumption arose that the amount of the award determined from the guidelines was the correct amount of child support to be awarded. However, this presumption was rebutted when the court made a written, specific finding on the record that an award in the amount determined from the guidelines would be unjust and inappropriate under the circumstances. *See* Pa. R.C.P. 1910.16–1(b). As the majority notes, Pa.R.C.P. 1910.-16–4 enunciates the requirements for deviation from a support amount derived from the guidelines. Rule 1910.16–4 provides, in relevant part:

> (b) In deciding whether to deviate from the amount of support determined by the guidelines, the trier of fact shall consider
>
> > (1) unusual needs and unusual fixed obligations;
> >
> > (2) other support obligations of the parties;
> >
> > (3) other income in the household;
> >
> > (4) ages of the children;
> >
> > (5) assets of the parties;
> >
> > (6) medical expenses not covered by insurance;
> >
> > (7) standard of living of the parties and their children; and
> >
> > (8) other relevant and appropriate factors, including the best interest of the child or children.

Thus, the court has reasonable discretion to deviate from the guidelines if it appears to be necessary. *Ball v. Minnick*, 414

Pa.Super. 242, 260, 606 A.2d 1181, 1191 (1992) (*en banc*). The trial court justified its deviation from the guidelines as follows:

The Court found that the public assistance aspect of this case constituted unusual circumstances, requiring deviation from the guidelines.

Because Mother was already receiving public assistance, this child had to be included in the family unit for purposes of calculating monthly welfare benefits. 42 U.S.C.A. § 602(a)(38) (West 1991); 45 C.F.R. § 206.-10(a)(1)(vii) (1991). *Accord* 55 Pa.Code § 171.21(b)(1) (1991). In addition, to be eligible for benefits, Mother had to assign any right to receive child support to DPW and assist in the collection of that support. 42 U.S.C.A. § 602(a)(26)(B) (West 1991). *Accord* Pa.Stat.Ann., tit. 62, §§ 432.6(e), 432.7 (Purdon Supp.1991); 55 Pa.Code §§ 141.21(c) and (d), 187.21(b), 187.23(a)(2) (1991).

Of the child support that would be collected each month, the first $50.00 would have to be passed through to the family in accordance with federal law. 42 U.S.C.A. §§ 602(a)(8)(A)(vi), 657(b)(1) (West 1991). The remaining support collected would be turned over to DPW as reimbursement, to be applied against the total amount of public assistance provided to the family. *See generally Bowen v. Gilliard,* 483 U.S. 587, 599–600 & n. 14, 107 S.Ct. 3008, 3016–17 & n. 14 [97 L.Ed.2d 485] (1988) [ (1987) ]. If DPW collected more in child support than it paid out in assistance for the family as a whole, the excess would be distributed to the family, should it ever stop receiving public assistance. 42 U.S.C.A. § 657(b)(4)(B). The result is that a Father's contributions for his child's support serve only to reduce the debt owed to the state by Mother and all the fathers of her children:

\* \* \* \* \* \*

This Mother was twenty-four years old at the time this child, her sixth, was born. By the time this case was listed before this Court, Mother had borne another child—her seventh child out of wedlock. (N.T. 3/9/92, at 3). These children had several different fathers, at least

134

two of which had paid or were currently paying support through the court. Because Mother was on welfare, this support was remitted to DPW as reimbursement for the public assistance the entire family was receiving. According to the federal requirements described above, other than the $50.00 pass-through, the support paid by Father would go to the child only if the family were taken off welfare, and if DPW had been reimbursed for the total assistance paid to *the family as a whole*. However, this Court found that a woman who had borne seven children by the age of twenty-four would likely never be able to remove herself from public assistance. (N.T. 3/9/92 at 18). Therefore, whatever support the Court ordered Father to pay for the support of the child would be turned over to DPW, and most likely retained by DPW to reduce the expense of the assistance paid for an eight-member (as of the hearing date) family. Under the circumstances, the Court found that entering a support order conforming to the guidelines would ultimately benefit DPW, rather than the child. Deviation was therefore appropriate.

Trial Court Opinion dated October 16, 1992, at pp. 3–6. (Emphasis in original.) Although the method of assignment of support to DPA, and the distribution of public aid as outlined by the trial court, has been held to be constitutional, *see Bowen v. Gilliard*, 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987), I fail to see how consideration of receipt of public aid by the mother as an unusual circumstance is inconsistent with or in derogation of federal law. In this instance, the trial court recognized that any monies in excess of $50.00 would not benefit the child and, even if the court found the child's needs exceeded $50.00 per week, the child would still only receive the $50.00 pass-through per month plus whatever sum is allotted by DPA for assistance of a family of eight persons. The fact that federal law provides that support monies in excess of the $50.00 pass-through per month decrease the custodial parent's debt to DPA (applied as recoupment for monies expended by DPA on other family members) in the

event that parent becomes self sufficient does not necessarily prohibit the court from finding the receipt of public aid as an unusual circumstance where it is doubtful that the family will ever be able to independently function without assistance. The unusual circumstance is *not* that the mother is receiving public aid, *per se,* but rather that the chances of ever removing herself from the system are slight. In this situation, the child receiving support and/or the family as a whole neither benefit nor suffer from a payment in excess of $50.00. Accordingly, I would find that the trial court, in this instance, did not abuse its discretion in deviating from the support guidelines.

For similar reasons, I also disagree with the majority's alternative basis for reversal. The majority finds that the trial court's financial conclusions regarding welfare cash allotment, food stamps, and medical assistance were merely guesses unsupported by the record. The record, however, reveals that the trial court was presented, by the assistant district attorney, a document from DPA, dated January 1, 1990, which delineated family allotments in the different counties, including Philadelphia County. The family allotments were calculated on the number of family members in a budget group. Therefore, there was a basis for the estimated cash assessment calculated for the family per month. As to medical benefits, the court determined that it need not include this in the calculation, since the father provided full medical benefits for the child. Accordingly, DPA was not responsible for, nor allotted resources for, medical care. Finally, with regard to food stamps, no evidence was presented to the court by the parties or their attorneys on exactly what mother received per month or per year in food stamps. Although the transcript reveals the court did make inquiry as to the amount, no one present appeared to know the answer. Accordingly, the trial court added to the amount which would be spent on the child in a year, by DPA, a sum of $500.00 for food. Although it is clear that this calculation was speculative, it did not prejudice the child or mother in the actual amount the family would receive, as this was determined by DPA guidelines, plus the $50.00 pass-through per month. The calculation made by the

136

court was merely an effort to reimburse DPA for its expenditures on the child. Accordingly, any error in this calculation was harmless error at worst. I would, therefore, affirm the order of the trial court.