**NEW PORT LARGO, INC., Plaintiff,**

v.

**MONROE COUNTY, Defendant.**

No. 87–10043–CIV–KING.

United States District Court,
S.D. Florida.

Dec. 21, 1994.

Jeffrey B. Crockett and Michael R. Seward, for plaintiff.

Alan G. Greer, James Hendrick and Randy Ludacer, for defendants.

### *MEMORANDUM OPINION*

JAMES LAWRENCE KING, District Judge.

New Port Largo, Inc. brought this action, alleging a temporary regulatory "taking" of its property by Monroe County, on July 7, 1987. The Plaintiff seeks compensation for an alleged regulatory taking pursuant to the Just Compensation Clause of the Fifth Amendment to the United States Constitution as made applicable to the states by the Due Process Clause of the Fourteenth Amendment. The Plaintiff asserts further claims for monetary damages for the unlawful regulatory taking under 42 U.S.C. § 1983 (1988) for violation of substantive and procedural due process rights.

New Port Largo, Inc. contends that Monroe County effected a temporary taking of its property and violated its civil rights by (1) creating a new zoning classification throughout the County of "PA–Private Airport" on

June 5, 1979, and (2) rezoning Plaintiff's property from RU–2 to Private Airport Use (PA) on September 11, 1980.[1]

## I. FINDINGS OF FACT

### A. CASE HISTORY

The property in question consists of twenty-five residential oceanfront lots,[2] dredged from the ocean to create a landing strip for an airport and a breakwater for an upland subdivision on Key Largo, Florida.

In August, 1968 the State of Florida sold the submerged land in question to a private trust for $4,000.

In presenting the matter to the Florida Cabinet (sitting as trustees of the Florida Internal Improvement Trust Fund), agents of the Trust, stated that the land dredged from the ocean bottom would be used to construct an airport landing strip for use by the citizens of the upper Florida Keys. The airport property, once the dredging, filling and paving of the runway were completed by the Trust developers, would be deeded to Monroe County for use as a public airport. An additional benefit to the public was the breakwater protection for the adjoining mainland property of approximately 150 property owners. The County joined the Trust developers in seeking approval from the Florida Cabinet for sale of the submerged lands. The sale was approved and a dredging permit issued by the Cabinet in August, 1968.

At that time, the Trust owned the upland property known as Port Largo, primarily consisting of platted waterfront residential lots on finger canals. The granting, by the Florida Cabinet (I.I. Board), of a dredging permit was valuable to the Trust developers for the dual purpose of obtaining the land fill necessary to construct the runway—breakwater, and to provide a deep water access canal to the finger canals of the subdivision development on the upland property. The Trust proceeded to dredge the deepwater canal which connected all the finger canals of the subdivision lots to the ocean and to create the breakwater lots. This was done at the expense of the private trust after Monroe County backed out of an oral understanding they had with the Trust developers to share in the cost of dredging the deepwater canal and construction of the airport landing strip.

The Trust developers, having obtained the land and permission to dredge the access canal that was vital to the development of the subdivision's finger canals, proceeded to dredge the canal and fill the land to create the breakwater which exists today. An airport known as the Port Largo Airport, operated on the breakwater from at least 1971 to early 1985. The airport was operated continuously throughout this period of time on lease arrangements between the airport operators and the Trust.[3] Under the lease, the Trust owners of the property received rental payments from the operators of the airport.

In 1972, the breakwater property was zoned by Monroe County as RU–2 Residen-

---

1. This case has been extensively litigated in both the federal and state courts. *See New Port Largo, Inc. v. Monroe County,* 706 F.Supp. 1507 (S.D.Fla.1988), *vacated,* 985 F.2d 1488 (11th Cir. 1993), *cert. denied* —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993); *New Port Largo, Inc. v. Monroe County,* 856 F.Supp. 659 (S.D.Fla.1994); *New Port Largo, Inc. v. Monroe County,* Case No. 80–1164 (Fla.Cir.Ct., Jan. 2, 1986) (Lester, J.); *Monroe County v. New Port Largo, Inc.,* Case No. 82–432 (Fla.Cir.Ct., Mar. 27, 1984) (Knuck, J.), *aff'd* 467 So.2d 757 (Fla.Dist.Ct.App.1985); *Petition for Writ of Mandamus denied,* (11th Cir., Oct. 7, 1994) (No. 9450–31).

2. Consistent with its original intended use as an airport, the property is 2,400 feet long and 150 feet wide. It is a long narrow stretch of land separating the Atlantic Ocean from a deepwater dredged canal. The residential lots are platted side by side along the length of the original runway, extending across the 2,400 foot length of the 9.65 acres from the Atlantic Ocean to the deepwater dredged canal to the rear of each lot. *See* Diag. 1.

3. The Port Largo Airport was continuously licensed by the State of Florida from at least 1974 to 1985. The licenses issued to the airport state that "[w]hen inspected, this airport met State Airport Standards for Public Use. Safe Air Traffic Patterns have been developed for this and other licensed airports in this vicinity. This license is revokable if unsafe conditions develop or for other reasons stated in the State Airport Licensing Law or the Rules and Regulations adopted thereunder."

tial.[4] On January 29, 1973 the lease operator of the Port Largo Airport applied for a change in the zoning of the property from RU–2 to BU–2, permitting the operation of the property as an airport. The property owners consented to the request by their lessee to the proposed change in zoning of the breakwater property.

The Monroe County Zoning Board denied the requested zoning change on March 23, 1973, but granted a variance from the existing RU–2 zoning "to operate an airport and facilities."

On June 5, 1979, the Monroe County Board of Commissioners enacted Ordinance 14–1979, which created a new zoning classification within the County of PA, or Private Airport.[5] Prior to this, there was no zoning classification in the Monroe County zoning classifications specifically pertaining to airports.

On January 30, 1979, New Port Largo, Inc. ("NPL"), the Plaintiff in this litigation, entered into a purchase and sale agreement to buy the Fourth and Fifth Additions of the Port Largo subdivision in Key Largo, Florida for $3,200,000. The entire property consisted of sixty-three acres, which included approximately 9.65 acres that encompassed Lots # 535–560. The Court will refer to Lots # 536–560 as the "breakwater property" or the "breakwater lots."

On September 1, 1979, NPL purchased the Fourth and Fifth Additions, including the breakwater lots from the private Trust. NPL bought the breakwater property subject to an airport lease that was to expire on July 14, 1982. At the time of the purchase, the breakwater property was zoned RU–2

with a variance for airport use and had been used as an airport since at least 1971.

In November 1979, Monroe County (the County) filed an application with the Zoning Department to rezone the property from RU–2 to private airport use (PA). On January 24, 1980, the Zoning Department held a hearing on the proposed rezoning and subsequently approved the County's application.[6] NPL appealed the Zoning Department's decision to the Monroe County Board of Commissioners (the Commission). On September 11, 1980, the Commission affirmed the Zoning Department's decision.

### B. LITIGATION HISTORY

On October 10, 1980, NPL filed a petition for a writ of certiorari in state circuit court alleging that the rezoning violated Florida law. NPL claimed that the County had not complied with the procedural requirements of its Major Development Project Ordinance, an ordinance that applies to rezonings which, as here, concern parcels of land greater than five acres. On September 9, 1982, during the pendency of its certiorari petition in the state court, the Plaintiff NPL sold the property in question for a profit, conveying one-half undivided interests in fee simple both to TFW, Inc., a Florida corporation, and to a land trust administered by the First National Bank of South Miami. Neither of these purchasers intervened in the certiorari proceeding brought by NPL and Plaintiff did not apprise the state court of the fact that it had sold the property.

In August 1985, NPL amended its petition to include a claim that the County had deprived NPL of its property "without offering compensation ... in violation of the constitu-

---

4. The RU–2 zoning classification "is intended to provide residential areas in which duplexes may be constructed and occupied". Monroe County, Fla.*Code* § 19–196 (1987).

5. Ord. No. 14–1979 (later codified as §§ 19–295 to 19–302 of the Monroe County *Code* ) provided that "[t]he provisions of this article shall apply to all presently existing private airports in Monroe County, as well as to all private airports which may be established in Monroe County hereafter." The ordinance also stated that "[t]he purpose of these regulations is to ensure the continued use of existing private airports".

6. The Ordinance limited the use of land in or adjacent to a PA district. It provided that "[t]he zoning director shall not give zoning approval for any building permits for any structure to be located within or adjacent to any private airport area if, when built, said structure would constitute a violation of the protective provisions of this article." It also provided that "[w]ithin or adjacent to the PA district, no establishments or uses that emit smoke, gas or dust in quantities or densities sufficient to jeopardize the safe use of private airports shall be allowed."

tions and laws of the United States and of the State of Florida". NPL also claimed that the rezoning did not comply with the dimensional requirements and safety regulations for a private airport. NPL asked the court to declare the rezoning invalid, to return the property to its RU–2 zone classification, and to provide any further relief the court deemed appropriate.

The state certiorari proceeding was stayed pending the final resolution of a second lawsuit. This lawsuit, instituted by Monroe County in early 1982, sought the imposition of a constructive trust on the breakwater property for the benefit of Monroe County on the strength of Darryl Sheley's representations years earlier. On March 27, 1984, the Florida Circuit Court entered judgment in favor of Plaintiff and against Defendant Monroe County in the constructive trust lawsuit. That judgment was affirmed on appeal. *Monroe County v. New Port Largo, Inc.*, 467 So.2d 757 (Fl.Dist.Ct.App.1985).

On January 2, 1986, the state court granted NPL's petition to invalidate the rezoning ordinance.[7] The Court found that the County's rezoning of the property to PA violated the dimensional requirements of a private airport zone and that the County had not complied with the procedures of its Major Development Project Ordinance. Accordingly, the court declared invalid and quashed the County's rezoning of the subject property. Because the court found that the County had acted in good faith in pursuing the rezoning, however, it did not award damages to NPL. Neither party sought appellate review of the court's decision.

After the successful zoning challenge, NPL filed the instant suit in United States District Court in 1987, raising Fifth Amendment and 42 U.S.C. § 1983 claims. On November 21, 1988, this Court found that NPL's claims were barred by a four year statute of limitations. *New Port Largo, Inc. v. Monroe County*, 706 F.Supp. 1507 (S.D.Fla.1988). Five years later, in 1993, the Eleventh Cir-

cuit Court of Appeals reversed, holding that NPL's regulatory takings claims were not time-barred. *New Port Largo, Inc. v. Monroe County*, 985 F.2d 1488 (11th Cir.1993) ("New Port Largo I").

Upon remand this Court bifurcated the issues of liability (takings issue) and damages. A bench trial on the alleged temporary takings issue was held first, to be followed by a jury trial on damages. NPL appealed the Order of Bifurcation by filing a Petition for Writ of Mandamus on October 4, 1994. The Eleventh Circuit denied NPL's application for Writ of Mandamus on October 7, 1994. *New Port Largo, Inc. v. Monroe County, Petition for Writ of Mandamus denied*, (11th Cir. Oct. 7, 1994) (No. 94–5031). Following denial of mandamus, this court conducted an eight day non-jury trial on the takings issue.

## II. CONCLUSIONS OF LAW
### A. RIPENESS

"[R]ipeness is a question of subject matter jurisdiction" which must be considered by the Court whether or not the parties raise the issue. *Reahard v. Lee County*, 978 F.2d 1212, 1213 (11th Cir.1992) ("Reahard II") (citing *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n. 7 (11th Cir.1989) and *Fitzgerald v. Seaboard System R.R.*, 760 F.2d 1249, 1251 (11th Cir.1985)). If Plaintiff's regulatory takings claim "could be satisfied through adequate state judicial procedures," Plaintiff has not stated "a ripe federal claim under *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and there is no subject matter jurisdiction." *Reahard*, 978 F.2d at 1213.

■ In Fifth Amendment just compensation claims, a plaintiff must establish (1) finality of the regulatory taking, and (2) exhaustion of state remedies. Finality was established prior to commencement of this action on July 7, 1987, exhaustion was not. This case was not ripe for federal adjudica-

---

7. Defendant urges the Court to disregard the factual findings made by State Circuit Judges Lester and Knuck in the two state court proceedings. Defendant reasons that these opinions are not entitled to full faith and credit because NPL

was not the real party in interest in those proceedings as a result of its sale of the breakwater property to TFW, Inc. and First National Bank Trust.

tion when filed, in that North Port Largo, Inc. did not (and has not to this date) sought damages for the alleged temporary taking of its property in the Florida Circuit Court, in inverse condemnation. This state remedy was available under the provisions of the Fifth Amendment to the United States Constitution and Article X of the Florida Constitution. *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) *Joint Ventures v. Department of Transp.,* 519 So.2d 1069 (Fl.Dist.Ct.App.1988), *aff'd* 563 So.2d 622 (Fla.1990); *Reahard v. Lee County,* 30 F.3d 1412 (11th Cir.1994) ("Reahard III").

■ Fifth Amendment takings claims fall into four categories: just compensation, due process takings, arbitrary and capricious due process and equal protection. *Eide v. Sarasota County,* 908 F.2d 716, 720 (11th Cir. 1990), *cert. denied,* 498 U.S. 1120, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991). The type of ripeness analysis undertaken by the court differs depending upon the type of constitutional takings claim involved. Both parties agree that NPL's takings claim falls within the just compensation category. (Rev. Joint Pretrial Stipulation at 1).

#### 1. *Fifth Amendment Just Compensation Takings Claim*

■ In order to state a ripe regulatory takings claim, a plaintiff/landowner must establish that the state has reached a final decision regarding the regulatory action and that he has exhausted all state remedies to obtain just compensation. *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186–97, 105 S.Ct. 3108, 3116–22, 87 L.Ed.2d 126 (1985). These two elements have been referred to as "the final decision hurdle and the just compensation hurdle." *Eide,* 908 F.2d at 720. If either one of the elements is missing, subject

matter jurisdiction is lacking. *Id.* at 723. A final decision is necessary because the Federal Courts cannot make a determination whether a landowner has been denied all use of his property until the state has "arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson,* 473 U.S. at 191, 105 S.Ct. at 3118. The "just compensation" hurdle is necessary because no taking occurs if the state provides just compensation to the aggrieved landowner. *Id.* at 195, 105 S.Ct. at 3121. Both ripeness elements must be satisfied concurrently for Federal jurisdiction to exist.

Recently, the Eleventh Circuit in *Reahard III* found that the Federal Courts lacked subject matter jurisdiction in a regulatory takings case where the *Williamson* prongs were not satisfied concurrently upon removal of the suit to Federal Court.[8] The Court found federal jurisdiction lacking after trial, a jury verdict of $700,000, and prior appellate consideration in *Reahard I,* 968 F.2d 1131 (11th Cir.1992), and *Reahard II.*

##### a. *Finality*

■ Applying the *Williamson* analysis to the instant case, the Court finds that the case is not ripe for adjudication because NPL has satisfied only the "final decision" hurdle. NPL's takings claim accrued on January 2, 1986 when Judge Lester issued his opinion in the state court proceeding and invalidated the PA zoning change. *See New Port Largo, Inc. v. Monroe County,* 985 F.2d 1488, 1495 (11th Cir.1993). Thus, NPL had a final decision before it instituted this suit in Federal Court in 1987. *Cf. Reahard v. Lee County,* 30 F.3d 1412, 1417 (11th Cir.1994) (finding that Federal jurisdiction did not exist at initiation of suit due to lack of finality).

##### b. *Just Compensation*

However, while the finality requirement was satisfied, the just compensation hurdle

---

8. In *Reahard,* the defendant removed the suit to Federal Court in 1989, but the final decision hurdle was not met until September 1990, more than one year after removal. *Reahard,* 30 F.3d at 1416. The Eleventh Circuit reasoned that when the Florida Supreme Court issued the *Joint Ventures* opinion, 563 So.2d 622 (Fla.1990), the Reahards lost the just compensation prong be-

cause they had not pursued the inverse condemnation remedy available to them in state court.

As discussed *infra,* an inverse condemnation remedy existed in state courts in Florida before the 1990 *Joint Ventures* opinion. Thus, the just compensation prong had not been satisfied even at the time the case was originally removed from state to federal court in 1989.

was never met in this case because NPL did not pursue its inverse condemnation claim in state court to obtain compensation for the alleged taking. The Constitution requires that a " 'reasonable, certain and adequate provision for obtaining compensation' exist at the time of the taking." *Williamson*, 473 U.S. at 194, 105 S.Ct. at 3120 (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974)). Moreover, *Williamson* explicitly states that "no constitutional violation occurs until just compensation has been denied." *Id.*, 473 U.S. at 193 n. 13, 105 S.Ct. at 3120 n. 13. A state compensation procedure "will be deemed available and adequate" under *Williamson*'s just compensation prong "even when that procedure remains unsure and undeveloped." *Southview Assoc., Ltd. v. Bongartz*, 980 F.2d 84, 99 (2nd Cir.1992); *accord Austin v. City of Honolulu*, 840 F.2d 678, 681 (9th Cir.1988) ("Until the state courts establish that landowners may not obtain just compensation through an inverse condemnation action under any circumstances, Hawaii procedures are adequate within the terms of *Williamson County* and [plaintiff's] failure to use them cannot be excused.").

■ At the time of the alleged taking[9], Florida did not prohibit inverse condemnation suits. Article X, section 6 of the Florida constitution forbids the taking of private property without full compensation and proper public purpose. *Village of Tequesta v. Jupiter Inlet Corp.*, 371 So.2d 663, 669 (Fla. 1979). Pursuant to this constitutional provision, Florida courts have recognized a cause of action for inverse condemnation when private property is taken by the state. For example, in *City of Jacksonville v. Schumann*, the Florida courts recognized an inverse condemnation claim where state regulatory action effected a taking without just compensation. *City of Jacksonville v. Schumann*, 167 So.2d 95, 102 (Fla.Dist.Ct.App. 1964) ("The constitutional provisions applica-

ble in Florida are consistent with, if they do not affirmatively require, the recognition of the concept of inverse condemnation."), *cert. denied* 172 So.2d 597 (Fla.1965).

A line of cases recognizes that Florida law permits a landowner to bring inverse condemnation claims for rezoning. *See Executive 100, Inc. v. Martin County*, 922 F.2d 1536, 1542 (11th Cir.1991) (district court in 1988 properly dismissed takings claim because plaintiff failed to bring inverse condemnation claim in state court to obtain just compensation), *cert. denied* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); *City of Pompano Beach v. Yardarm Restaurant, Inc.*, 641 So.2d 1377, 1382, 1388 (Fl.Dist.Ct. App.1994) (finding that an inverse condemnation claim for regulatory taking was properly filed in 1987, although plaintiff failed to demonstrate that taking had occurred and four year statute of limitations for inverse condemnation action had expired).

■ Inverse condemnation for regulatory taking has been available in Florida for denial of a permit which deprives an owner of any reasonable use of the property. *Key Haven Assoc. & Board of Trustees of Internal Improvement Trust Fund*, 427 So.2d 153 (Fla.1982). *See Corn v. City of Lauderdale Lakes*, 816 F.2d 1514, 1518 n. 6 (11th Cir. 1987) ("A separate action in inverse condemnation for an uncompensated, although valid, permit decision amounting to a taking, will lie."), *aff'd*, 904 F.2d 585 (11th Cir.1990), *aff'd in part, rev'd in part*, 997 F.2d 1369 (11th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994).

In 1987, the Supreme Court recognized that the Fifth Amendment's Just Compensation Clause requires states to provide compensation for temporary regulatory takings. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). In *First English*, the state court struck the portion of the plaintiff's inverse condemnation claim

9. Plaintiff contends that the takings period runs from September 11, 1980 to January 2, 1986, when Judge Lester invalidated the PA zoning. However, in March 1994, this Court limited the takings period to the time from September 11, 1980 to September 9, 1982. *New Port Largo, Inc.*

*v. Monroe County*, 856 F.Supp. 659 (S.D.Fla. 1994). September 9, 1992, rather than January 2, 1986, represents the end of the takings period because on September 9, 1982 NPL sold all of its ownership interest in the breakwater lots to Land Trust 741 and TFW, Inc.

that requested money damages for a regulatory taking. The Supreme Court found that the Fifth Amendment required money compensation, not just injunctive relief, and remanded the case to state court. Thus, the Supreme Court implied that states must provide an inverse condemnation remedy for temporary regulatory takings.

In 1988, relying on *First English,* the First District Court of Appeal issued an opinion expressly holding that inverse condemnation existed for regulatory takings in Florida. *Joint Ventures, Inc. v. Department of Transp.,* 519 So.2d 1069, 1071 (Fl.Dist.Ct. App.1988). "Thus, the court in *First Lutheran Church [First English]* recognized that when a taking occurs, independent of any statutory authorization a landowner has a constitutional right to file an action in inverse condemnation in an appropriate forum, which in this state could be the circuit court." *Id.* (citing *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987)). The Florida Supreme Court affirmed the District Court of Appeal in its 1990 *Joint Ventures* opinion. *Joint Ventures, Inc. v. Department of Transp.,* 563 So.2d 622 (Fla. 1990); *Reahard v. Lee County,* 30 F.3d 1412, 1417 (11th Cir.1994) (stating that Florida Supreme Court resolved ambiguity in law by explicitly recognizing inverse condemnation cause of action).[10]

In *New Port Largo I,* the Eleventh Circuit stated "[a]t the time of the state circuit court's final judgment, Florida courts did not recognize damages claims arising from regulatory takings." *New Port Largo,* 985 F.2d 1488, 1493 (11th Cir.1993) (citing *Dade County v. National Bulk Carriers, Inc.,* 450 So.2d 213 (Fla.1984)).[11] The Eleventh Circuit might reach a different conclusion today in light of the United States Supreme Court's

decision in *First English* and the Florida Supreme Court's decision in *Joint Ventures,* which overruled the *National Bulk Carriers* line of cases.

NPL thus had a remedy in state court to obtain just compensation. The Florida courts explicitly recognized this remedy in January, 1988. *See Joint Ventures, Inc. v. Department of Transp.,* 519 So.2d 1069, 1071 (Fla.Dist.Ct.App.1988), *aff'd* 563 So.2d 622 (Fla.1990). NPL's takings claim does not meet the second *Williamson* prong. Therefore, NPL's just compensation claim is not ripe because NPL failed to pursue an inverse condemnation remedy in state court to obtain just compensation for the alleged taking.

### 2. *Due Process Claims*

▪ Although the Court lacks jurisdiction to consider the Fifth Amendment takings claim, an independent basis of subject matter jurisdiction exists with respect to the due process claims. A procedural due process claim is not a claim for money damages and therefore the issue of inverse condemnation is irrelevant. A final decision is the only requirement for a ripe procedural due process claim. NPL has satisfied that requirement.

▪ Substantive due process claims under § 1983 arise the moment a governmental body acts in an arbitrary or capricious manner and applies that arbitrary action to a landowner's property. *Resolution Trust Corp. v. Town of Highland Beach,* 18 F.3d 1536, 1547 (11th Cir.1994); *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1574 n. 8 (11th Cir.1989). This is true regardless of whether the landowner is later compensated for the arbitrary and capricious governmental action. *Id.* Although the Eleventh Cir-

---

**10.** Several cases have recognized the *First English* rule in Florida. *See Villas of Lake Jackson v. Leon County,* 796 F.Supp. 1477 (N.D.Fla. 1992); *Barima Investment Co. v. U.S.,* 771 F.Supp. 1187 (S.D.Fla.1991), *aff'd* 959 F.2d 972 (11th Cir.1992); *Monroe County v. Gonzalez,* 593 So.2d 1143 (Fla.Dist.Ct.App.1992).

**11.** In *Dade County v. National Bulk Carriers, Inc.,* the Florida Supreme Court held that an inverse condemnation action was "not necessary" and

that a suit to invalidate the rezoning was the proper remedy. The Second District Court of Appeal then extended the *National Bulk Carriers* holding to find that "a zoning change cannot give rise to a cause of action for inverse condemnation." *Grady v. Lee County,* 458 So.2d 1211, 1212 (Fla.Dist.Ct.App.1984); *see also Lee County v. Morales,* 557 So.2d 652, 656 (Fla.Dist.Ct.App.), *rev. denied,* 564 So.2d 1086 (Fla.1990).

cuit in *Corn I*[12] suggested that both finality and denial of just compensation were prerequisites to bringing a § 1983 substantive due process claim, the Eleventh Circuit later expressly rejected that argument. *Greenbriar,* 881 F.2d at 1574 n. 8. Here, NPL's substantive due process claim became ripe when Judge Lester issued his opinion on January 2, 1986. Consequently, NPL's procedural and substantive due process claims under § 1983 are ripe for review by this Court.

## B. COUNTY'S LIABILITY

This Court recognizes that a prior opinion in this same case is binding on the trial court as the law of the case. For that reason, and following the mandate of *New Port Largo I* to proceed with this litigation on remand, the Court will therefore examine the merits of the Fifth Amendment takings claim.

### 1. *Fifth Amendment Taking*

■ The Fifth Amendment prohibits the taking of private property for public use without just compensation.[13] This guarantee is "designed to bar Government from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). However, "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). Thus, not all governmental regulation which affects

property values will constitute a Fifth Amendment regulatory taking.

■ Under the Fifth Amendment, a regulatory action must be for a valid public purpose or a taking will occur.[14] *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The Supreme Court held that even when the government acts with a valid public purpose, the state must compensate the landowner where there is physical invasion of the subject property or where the regulation deprives a landowner of all economically beneficial or productive use of land. *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992).[15]

### a. *Physical Invasion of Land*

■ Plaintiff argues that Monroe County, by changing the zoning from RU–2 to PA, forced NPL to operate a public airport for the County at NPL's expense, thereby invading the land and appropriating the property for public use. Plaintiff interprets the PA zoning ordinance to require the landowner to operate an airport that is open to the general public. The Court finds this argument to be without merit. The PA zoning did not affirmatively require NPL to operate an airport on the breakwater lots. The zoning ordinance *allowed* a business person to operate a private airport for use by business invitees.[16] During the period of PA zoning, NPL's breakwater lots were never physically invaded. Because there was no physical invasion, the Court must inquire whether the state action deprived NPL of all or substantially all economically viable use of the land.

---

12. *Corn v. City of Lauderdale Lakes,* 816 F.2d 1514, 1516 n. 2 (11th Cir.1987), *aff'd,* 904 F.2d 585 (11th Cir.1990), *aff'd in part, rev'd in part,* 997 F.2d 1369 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1400, 128 L.Ed.2d 73 (1994).

13. It is well settled that the Fifth Amendment applies to the states through the Fourteenth Amendment. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978) (citing *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585, 41 L.Ed. 979 (1897)).

14. The Court finds that Monroe County acted for a valid public purpose. *See infra* II.B.2.b.

15. In *Lucas,* the Supreme Court suggested that the rationale for compensating a property owner who loses all economically beneficial use of land due to regulation is that the government action is equivalent to a physical appropriation. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2894.

16. The Ordinance defines "private airport" as "an airport used primarily by the licensee, but available for use by invitation of licensee[s]". Ord. No. 14–1979 (later codified as Monroe County, Fla.Code § 19–196).

b. *Deprivation of All Economically Viable Use of Land*

To determine whether state action deprives "a landowner of all economically viable use of his property," the Court examines "the economic impact on the claimant and the extent to which the regulation interferes with investment-backed expectations." *Resolution Trust Corp. v. Town of Highland Beach,* 18 F.3d 1536, 1549 (11th Cir.1994) (citing *Bowen v. Gilliard,* 483 U.S. 587, 606, 107 S.Ct. 3008, 3020, 97 L.Ed.2d 485 (1987)). "The ad hoc, case-by-case inquiry which accompanies this determination requires no more than an application of the law to the facts." *Id.*

Applying the law to the facts of this case, the Court finds that a temporary taking did not occur when Monroe County rezoned the breakwater lots from RU–2 (with an airport variance) to PA.

i. *Economic Impact*

The Court finds that the rezoning's effect on NPL did not deprive NPL of all economic use of the property. Economically viable alternative uses of the property existed under the PA zoning. Plaintiff contends that the only permissible use under PA zoning was the operation of a private airport, which Plaintiff contends, generates minimal revenue and renders the land worthless. However, this argument is premised on the assumption that the only use allowed under PA zoning is airport operation.

The PA zoning ordinance limits certain uses of land in or adjacent to a PA-zoned area: "[t]he zoning director shall not give zoning approval for any building permits for any structure to be located within or adjacent to any private airport area if, when built, said structure would constitute a violation of the protective provisions of this article." Ord. No. 14–1979. Activities that "emit smoke, gas or dust in quantities or densities sufficient to jeopardize the safe use of private airports" violate the protective provisions of the ordinance. *Id.* The Coun-

ty Ordinance permitted any use of the property not inconsistent with these limitations.

Defendant's witness presented extensive testimony of economically viable uses the property owner could have made of the breakwater lots consistent with PA zoning. The witness testified that NPL could have operated the airport profitably, constructed and sold condominium boat slips on the deepwater canal, rented dry dock storage or established a beach club for rental or sale to the upland property owners; all of which is consistent with, and not proscribed by, the zoning ordinance.

Based on the expert testimony presented, the Court finds that an airport could be operated profitably on the breakwater lots. The existing airport lease did not provide NPL with substantial income. However, Defendant's evidence reveals that the airport could have been operated profitably. Through effective marketing and advertising, an airport operator could generate significant revenue from fuel sales, airplane tie-downs and landing fees.

Defendant's proof was clear and convincing that NPL could have sold the PA-zoned land to a developer who would have constructed condominium boat slips along the canal side of the property. The canal channel is sufficiently wide to accommodate bulkheading of the property and construction of boat slips. Indeed, nearby lots were used as a marina, operating off this same canal. Such a sale would have provided Plaintiff with a significant profit. Defendant's appraisal expert, Mr. Canon, testified, and the Court finds, that the present value as of September 11, 1980 of the PA-zoned breakwater lots was $1,280,000 to a single purchaser who would construct and develop the boat slips.[17] Mr. Canon further testified that this use would be more profitable than selling the land as unimproved lots with RU–2 zoning. Mr. Canon estimated that the present value as of September 11, 1980 of the RU–2–zoned property was $980,000 if sold for residential con-

---

17. Mr. Canon's calculations excluded consideration of the Army Corps of Engineer's dispute which, according to Mr. Netter, impeded the sale of the property. NPL settled the dispute on October 14, 1981 and paid the Army Corps of

Engineers $500,000. *See infra* text accompanying note 20. For this, and other reasons, the Court finds the testimony of Defendant's experts on value to be the more believable.

struction. Plaintiff's expert, Mr. Grayser, testified that the RU–2–zoned breakwater lots were worth at least $1,700,000 and possibly more. The value difference between the $1,700,000 and $980,000 figures for the RU–2–zoned breakwater lots does not alter the economic value analysis under *Penn Central, Lucas* and *Highland Beach* because the lots had a value of $1,280,000 after the rezoning to PA and this does not deprive NPL of "all or substantially all" value.

Another proffered use was the sale of the breakwater property to the Port Largo homeowners for recreational purposes. The homeowners could construct and organize a beach club that would include tennis courts and swimming facilities. The construction of a beach club would also enhance the value of NPL's remaining interior lots in the Fourth and Fifth Additions. This is all consistent with PA zoning. During this time period the Upper Florida Keys experienced a shortage of boat storage space. The record establishes that the breakwater lots had value as dry storage for boats.[18]

The Court finds that the highest and best use of the property was residential development, but finds that significant value existed under the PA zoning due to the proven alternative non-airport uses. Therefore, NPL, unlike the plaintiff in *Lucas,* could have availed itself of alternative, economically viable uses of the property and did not suffer a substantial adverse economic impact.

### ii. *Investment-backed Expectations*

The Court next examines whether the rezoning interfered with NPL's reasonable investment-backed expectations. NPL's investment-backed expectation in purchasing the breakwater property was to profit from resale of the property. NPL did not purchase the property with any intention to improve the property, but instead planned to resell the land as undeveloped lots. NPL presumably intended to sell the lots with the existing zoning, RU–2 with an airport variance, and subject to the airport lease. During the interim between NPL's purchase of the lots and the rezoning of the breakwater property, NPL did not sell, nor did it execute contracts to sell, any of the breakwater lots.[19] After the rezoning and up to the time NPL sold all its interest in the breakwater lots, NPL had no contracts to sell the breakwater lots. In fact, Mr. Charles Netter, one of NPL's principals, testified that NPL could not sell any of the lots until NPL resolved a dispute with the Army Corps of Engineers regarding dredging and filling that occurred during NPL's development of the Port Largo Subdivision. Mr. Netter testified that NPL could not sell the lots until October 14, 1981, the date NPL signed the consent degree with the Army Corps. Moreover, during the entire takings period, NPL sold only the less valuable inland lots it owned in the Fourth and Fifth Divisions, instead of the more valuable breakwater lots.[20] Therefore, NPL presented no evidence to suggest that prior to the sale to Land Trust 741 and TFW, Inc., NPL's investment-backed expectations were defeated.

When NPL sold the land, it made a profit. NPL's income tax return for the year ending January 31, 1983 reports a profit of $92,860 from the sale of certain breakwater properties to Land Trust 741 and TFW, Inc.[21] Thus, even assuming NPL did not earn as great a profit from the sale of the PA-zoned land as it would have earned from the sale of RU–2–zoned land, NPL nonetheless earned a profit and its reasonable investment-backed expectations were met within the definition

**18.** Defendant suggested that the breakwater had economic value simply as a land mass which protected the inland lots from storm surge and prevented silting of the canals. However, this is an intrinsic value of the land and is not an economically viable use of the land.

**19.** *See New Port Largo v. Monroe County,* 856 F.Supp. 659 (S.D.Fla.1994) (discussing proposed contracts that NPL submitted as evidence of sales of breakwater lots).

**20.** It may be inferred that NPL, which had no contracts to sell the breakwater lots, intended to sell only the less valuable inland lots while the breakwater lots appreciated in value.

**21.** The profit may have been greater because the tax return lists only the sale of lots # 537–560 and does not list the sale of lot # 536. Moreover, this was a sale of the property to entities controlled by NPL's principals, Mr. Netter and Mr. Marr. Thus, the sale price may not reflect actual fair market value.

of that term in *Penn Central* and *Highland Beach.*

## 2. *Section 1983 Due Process Claims*

The Court considers two factors in determining whether government action violates an individual's due process rights under 42 U.S.C. § 1983. The Court must determine (1) whether the action deprives the individual of a constitutionally protected interest; and (2) whether the deprivation, if any, occurred without procedural or substantive due process. *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1577 (11th Cir.1989).

In applying this two-part test, the "key inquiry in a case is the second prong of the test. Substantive [and procedural] due process protect[ ] a general right of an individual to be free from the abuse of governmental power." *Rymer v. Douglas County,* 764 F.2d 796, 802 (11th Cir.1985). Assuming arguendo that NPL had a vested property interest in the RU–2 zoning, the Court next examines whether the rezoning violated NPL's due process rights.

## A. *PROCEDURAL DUE PROCESS*

█ Procedural due process requires adequate notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971).

█ The Monroe County Zoning Board held a hearing on January 24, 1980 to discuss the proposed zoning change of the twenty-five breakwater lots.[22] Plaintiff alleges that it did not receive written notice of the January 24, 1980 hearing. The testimony of Plaintiff's principals is clear, however, that they received informal notice and did, in fact, attend the hearing accompanied by attorneys and an independent court reporter. On January 24, 1980, the Monroe County Zoning Board voted 4–1 to rezone the subject property.

Procedural due process also requires that the individual have a meaningful opportunity

to be heard. Plaintiff's complaint alleges that the zoning board was predisposed toward PA zoning before the hearing was held and that this lack of impartiality denied Plaintiff a meaningful opportunity to be heard. Mr. Netter's testimony, however, revealed that in his appearance before the board, both he and Plaintiff's attorneys participated fully in the hearing with examination of witness, presenting evidence and orally arguing their position. At the conclusion of the hearing, Mr. Netter specifically thanked the Board for its fairness and objectivity. Plaintiff has failed to prove that it did not receive adequate notice and did not have a meaningful opportunity to be heard during the rezoning process.

Moreover, Plaintiff appealed the zoning board's decision and attended a hearing before the Monroe County Board of County Commissioners on September 11, 1980. At that hearing, Plaintiff argued the merits of its position and was permitted to present and cross-examine witnesses. Thus, the Court finds that Plaintiff's procedural due process claim is without merit.

## B. *SUBSTANTIVE DUE PROCESS*

█ Zoning regulations do not violate substantive due process rights unless they "are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926); *Spence v. Zimmerman,* 873 F.2d 256, 258 (11th Cir.1989) (the state, when zoning land, must not act "for an improper motive and by means that were pretextual, arbitrary and capricious, and … without any rational basis."); *Resolution Trust Corp. v. Town of Highland Beach,* 18 F.3d 1536, 1549 (11th Cir.1994).

Plaintiff contends that the County acted with an improper motive when it rezoned the breakwater lots. NPL claims that Monroe County sought to force NPL to operate an unsafe airport in order to avoid the costs,

---

22. The actual zoning change only affected lots # 536–560. Lot # 535 was not rezoned. *See* Diag. 2.

responsibilities and liabilities of operating the airport itself. In pressing its contention that the Board's actions were arbitrary and capricious, Plaintiff also claims that the Board rezoned because of complaints by adjacent property owners who feared that Plaintiff would construct a high-rise condominium that would obstruct their scenic view.

Defendant asserts several bases for its zoning decision, all of which relate to the public health, safety and general welfare. Defendant contends that its motive for rezoning was to improve access to the Upper Florida Keys,[23] to provide a means for medical air evacuation in the event of a hurricane or other emergency, and to conform the zoning to its historic existing use pursuant to the variance. Furthermore, once Private Airport zoning took effect, the County never forced Plaintiff to assume responsibility for airport operation and Plaintiff never operated the airport itself.

Moreover, a board's attention to constituents' concerns does not deprive a board's decision of a rational basis. A County planning board or City Commission is not a judicial forum. Rather, it is a legislative body that is accountable through the exact democratic processes to which Plaintiff objects. *See Higginbotham v. Barrett,* 473 F.2d 745, 747 (5th Cir.1973) ("[T]he zoning of property ... involves the exercise of judgment which is legislative in character and is subject to judicial control only if arbitrary and without rational basis.") In *Greenbriar,* the Eleventh Circuit noted with approval the Seventh Circuit's reasoning on this point:

[N]othing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic ... government, operations which are permeated by pressure from special interests.... The fact 'that town officials are motivated by parochial

views of local interests which work against plaintiff's plan and which may contravene state subdivision laws' ... does not state a claim of denial of substantive due process.

*Greenbriar,* 881 F.2d 1570, 1579 (11th Cir. 1989) (quoting *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir.1988)).

In light of the foregoing, the Court finds that the County's action was substantially related to the general welfare and conformed the zoning to its existing use. Plaintiff has not sustained a section 1983 substantive due process claim because Plaintiff has failed to demonstrate that the Board acted arbitrarily or capriciously in zoning and that the change lacked a rational basis.

### III. CONCLUSION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised in the premises, it is

ORDERED, ADJUDGED and DE-CREED that:

1. Plaintiff's Fifth Amendment takings claim fails because Plaintiff has not demonstrated that the County's rezoning of the breakwater lots deprived NPL of all or substantially all economically viable use of the property;

2. Plaintiff's 42 U.S.C. § 1983 procedural due process claim is without merit because Plaintiff received notice of the hearings and had a meaningful opportunity to be heard;

3. Plaintiff's 42 U.S.C. § 1983 substantive due process claim fails because the County's actions in rezoning the breakwater lots were neither arbitrary nor capricious;

4. For the reasons set forth herein, Monroe County is entitled to the entry of judgment in its favor.

5. Final judgment will be entered by separate order.

DONE and ORDERED.

---

**23.** Access to the Florida keys is limited to U.S. 1, a single two-lane road. The airport thus offered residents and tourists an alternative means of transportation and helped promote economic development.

Diagram 1

PORT LARGO

KEY LARGO, MONROE COUNTY, FLORIDA

Diagram 2

Out Lot

**APPLICATION FOR PUBLIC HEARING**

**November 27, 1979**

AIRSTRIP

535 536 537 538 539 540 541 542 543 544 545 546 547 548 549 550 551 552 553 554 555 556 557 558 559 560

EXHIBIT "A"

Description of Port Largo Airstrip,
Key Largo, Monroe County, Florida

A private airstrip (approx. 80' by 2400'), located in a portion of Government Lot 2, Section 33, Township 61 South, Range 39 East, and also the adjoining submerged land as described in T.I.I.F. Deed # 24,873, and being more particularly described as follows:

Inclusive of lots 536 through 560 and the 40 feet wide private road, and excluding the submerged out lots 545 through 559, all part of "Port Largo Fifth Addition", as recorded in Plat Book 6, Page 109 of the Public Records of Monroe County, Florida.

